## PAUL E. HAWKINSON CO. v. WILCOXEN.

### No. 9851.

Circuit Court of Appeals, Sixth Circuit.

May 23, 1945.

Harold Olsen, of Chicago, Ill. (Ralph F. Merchant, of Minneapolis, Minn., and William L. Wallace, of Lexington, Ky., on the brief), for appellant.

No brief filed for appellee and no counsel appearing at the argument.

Before HICKS, HAMILTON, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

As this case comes to us, it is a suit by Paul E. Hawkinson Company against G. Clyde Wilcoxen, doing business as Safety Retreading & Vulcanizing Company (herein called Wilcoxen) for infringement of Letters Patent No. 1,917,262 (herein called No. 262), issued on July 11, 1933, to P. E. Hawkinson for "Apparatus for Retreading Tire Casings" and assigned to appellant; and for infringement of Reissue Patent No. 21,956 issued to Hawkinson on November 25, 1941, for "Method of Retreading Tire Casings" and assigned to appellant. Ap-

pellant relied upon Claim 1 of No. 262 and Claims 1 and 6 of the Reissue.

The chief defenses were non-invention, anticipation and non-infringement. The District Court held the claims invalid for lack of invention.

Appellee filed no brief and made no argument upon this appeal.

In all retreading operations there are certain basic similarities. A portion, and in some instances, all of the old rubber is buffed off to provide a proper surface for application of the new rubber. A strip of new uncured rubber or "camel back" is applied to the buffed surface of the old tire, varying in width according to the practice of covering only the tread portion or a part of the shoulder also. The tire casing with the new·rubber affixed is placed in a mold and a resilient filler, consisting of an air bag, of a pad actuated by springs or screw pressure or of a coil spring, is inserted into the casing to press the tire against the mold and the new rubber is vulcanized to the old rubber by the application of heat, obtained by the insertion of the assemblage into a steam kettle, by circulating steam in chambers of the mold or by the utilization of electric heating devices.

Although the general method and sequences are the same, the practice and apparatus have differed greatly in detail. Most of the prior art molds were heavy, cumbersome affairs of cast iron, weighing many hundreds of pounds. They were both slow to heat and slow to cool and this fact cut down production. Most of them were designed to cover not only the tread portion of the tire casing but the shoulders and side walls as well, and the reheating tended to deteriorate the old shoulder and side wall rubber. To avoid this, some molds were designed to permit circulation of cooling fluids through that part of the mold coming in contact with the side walls, while steam was being circulated through that part encompassing the new rubber. In one assembly, cooling fluid was passed through a core inside the casing, and in another, insulating material was used between the casing and mold.

These molds were not only heavy and costly but relatively unadjustable. Some adjustability was secured by providing different sized matrices or tread bands, that is, the parts which carried the tread design. The matrices fitted into the mold proper between it and the tire, and came in sections, either arcuate or ring-shaped, and adjustment was made by shims and spacing rings. One or two patented retreading apparatuses used a lighter metal for the mold, with a sliding telescopic adjustment to permit accommodation of different sized tires.

However, most of the molds were of heavy cast construction, either hinged radially and opening like handcuffs, to receive a tire, or split circumferentially, and opening like an old fashioned watch case. The tire was inserted in the open mold, the matrices having already been placed therein, and the mold was then clamped together around the matrices and tire. Since the molds were U-shaped in cross-section, when their parts were bolted together, if the tire were too large, the fabric was sometimes forced into a wrinkle, which was vulcanized permanently into the retread and later· caused trouble. If the tire were too small, its fabric was strained when the air bag was pumped up to force it against the mold, and if it did`not fit tightly into the mold during vulcanization the new rubber exhibited a tendency to come loose during use.

Another prior art structure was the "third circle" mold. It was drawn from a length of seamless brass tubing and was U-shaped in cross-section. During vulcanization, it covered a segment of the tire only, and had to be shifted around the tire two or more times to complete the retreading of the full circle. There was testimony that it had two drawbacks,—the first, that the rubber tended to squeeze out at the end of the mold, forming bumps on the tire; and second, that when the mold was shifted, there was overlapping and parts of the tire were heated twice with consequent deterioration of the rubber.

The Hawkinson mold was made out of a flat piece of light weight metal having several shallow U-shaped ridges pressed lengthwise therein, to form the tread design on the new rubber. The whole was fashioned .into a circle and the two ends were welded together. The heating element consisted of piping of soft metal wrapped around the outside and welded to it. Except for the shallow annular convolutions, forming the tread design, the Hawkinson mold was cylinder-like and unlike the prior art molds which were somewhat similar in general design to a hollow doughnut; and except for the tread design convolutions, the

Hawkinson mold was flat in cross-section and not U-shaped like those of the prior art. A mold for use on the average sized tire weighed about thirty-five pounds and its cost was much less than those of the prior art. Hence, if an operator needed various sized molds, he could purchase them without a prohibitive outlay. It was testified to and also noted in the specification of No. 262 that because of the light weight of the metal in the Hawkinson mold, it could be heated and cooled rapidly and that this was better for the rubber and easier on the operator.

The Hawkinson mold was designed to be used with a tire having a circumference greater than that of the mold itself. This was accomplished by spreading the beads of the tire apart simultaneously at several points, thus reducing the circumference of the tire sufficiently to slip it into the mold. After its insertion the beads were released and the tire sprang by its own resiliency against the mold and additional pressure was exerted in the vulcanizing operation by the use of an air bag. It might be observed in passing that the spreading device used with the Hawkinson mold was a rather intricate piece of machinery invented by Hawkinson to spread open the tire for examination for defects. Its use was not necessary to the Hawkinson mold, since Wilcoxen stated that he first spread the beads apart and propped them open with pieces of wood. However, its use was a great convenience in the practice of the Hawkinson method, even though it was not claimed in either patent.

Since the Hawkinson mold was flat, the new rubber was vulcanized in a flat position and the over-all circumference of the tire was less than it would be when it was released and pumped up. It is asserted that this flat vulcanization was an advantage because it tended to strengthen the tire which in normal use was itself more or less flat at the point of contact with the ground. This appears with reason to be true.

The Hawkinson mold did not come down over the shoulders of the tire but retreaded only that portion receiving the major wear and did not disturb or injure, with heat or otherwise, the shoulders or side walls.

Claim 1 of No. 262 is as follows: "1. A tire treading device comprising an integral cylinder-like mold of relatively thin metal formed near its opposite edges with cross-sectionally U-shaped inwardly extended unbroken tread material confining flanges spaced a distance slightly greater than the width of a tread to be applied to the crown portion of a tire, and said thin metal mold being free of tire side wall engaging portions and formed between said tread confining surfaces with cross-sectionally U-shaped inwardly extending tread design forming surfaces, said continuous confining surfaces and said tread design forming surfaces stiffening the structure but leaving the same with such resilience that it will, if out of true round, be brought into true round by circumferential expanding pressure of a tire placed therein, and heating means extending circumferentially of said mold."

The specifications state: "Among the important objects of the invention is the provision of a light-weight annular tire treading mold that can be easily and conveniently handled, will heat and cool rapidly, and has such a degree of resiliency that it will, if out of true round, be brought into true round by a circumferential expanding pressure of a tire placed therein. A further object of the invention is the provision for a relatively flexible mold, of a flexible heating means extended circumferentially of the mold and which will flex with the mold."

We conclude that upon the record presented here the claim connotes invention. We think that the Hawkinson mold went beyond the skill of an expert and that its conception and construction involved more than the obvious. It certainly achieved large commercial success. It is true that some of the elements in the combination are old, but whether some are old and some are new is not material, for the patent is in the combination and the combination has produced a new, worthwhile and much needed invention. Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 318, 29 S.Ct. 495, 53 L.Ed. 805; Hug v. Lakewood Engineering Co., 6 Cir., 7 F.2d 98, 99. Hawkinson shook loose from the prior conception of U-shaped molds and devised an apparatus that was palpably new. We think that it has all the elements of validity, to wit, novelty, utility and invention. United States Gypsum Co. v. Consolidated Expanded Metal Cos., 6 Cir., 130 F.2d 888, 890. In the prior art, only the patent to Howell, No. 1,641,-490—1927, disclosed a mold of "continuous and unbroken construction" and only one of

its six claims was for this continuous ring. The continuous construction of the Howell patent was confined in the specifications to "use with small and easily flexed or collapsible tires." It was not prior art; nor apparatus useful for retreading the heavy duty tires of today. It presented no such combination of elements as are presented in the Hawkinson mold. There was nothing in it that indicated that the circumference of the mold was less than the circumference of the tire to be inserted therein.

Only three prior art patents disclose relatively thin structures; two of these, one to Dunlop, an English patent, 1930, and one to Shriver & Heasley, No. 1,330,958—1920, were for the "third circle" type of mold, and the third to Munger, No. 1,334,-629—1920, which, though made of thin metal was obviously U-shaped in cross-section.

Not one had the simple integral cylinder-like mold of Hawkinson, free of side wall engaging portions. It is true that in two prior art patents to Burdette, Nos. 1,579,-641—1926, and 1,746,763—1930, the circumference of the mold sections was shorter than that of the tread of the casing. In the construction of those patents the mold was hinged and drawn around the tire, and the simple method of Hawkinson was not practiced. It was stated in the specification of both Burdette patents that when the mold was closed down on the tire, "the side walls of the casing are flexed outwardly"; and in the first Burdette patent it was stated that the support and tread encircling means were so arranged "as to permit relatively free lateral flexing of the side walls of the casing." However, the drawings of both Burdette patents show that the tread mold was at least shallowly U-shaped and the testimony and exhibits tend to show that if the Burdette apparatus was used, the vulcanized tire would be clover-shaped in cross-section, an unnatural position, which the carcass does not take when it is inflated and off the road, nor when it is in contact with the road. It is clear that Burdette did not have the Hawkinson concept.

As pointed out above, the Reissue claims in suit were for method. Claim 1 called for,—"The method of treading tire casings, which comprises spreading the side walls of the casing laterally at circumferentially spaced points to circumferentially contract the crown portion of the casing, then placing the circumferentially contracted casing, with a matrix having an inside circumference less than that of the normal circumference of the casing, permitting expansion of the casing against the matrix by relieving the same from lateral spreading action, applying circumferential expanding pressure to the casing to expand the same under pressure against the matrix, and appying heat to the matrix."

Our discussion of the prior art indicates that the method practiced in this claim had no near counterpart therein. The Burdette patents, only, disclosed molds of lesser periphery than that of the tire presented for vulcanization. The later Burdette patent, for method, called for the disposition of "the carcass in rigid segmental molds having smaller external peripheries than the external periphery of the carcass, *drawing segments of the mold together to restrict the circumference of the carcass.* * * *" (Italics ours.)

This is a far cry from the Hawkinson method, which spread the side walls of the casing to reduce its circumference sufficiently that it would fit into the mold. The bias arrangement of the cords permitted this to be done without harm to the tire. In fact, spreading the side walls for inspection inside the casing had been widely practiced. The circumference of the tire had been reduced in that practice but no use was made of it. It was not until Hawkinson perceived the reduction and seized upon the phenomenon to make possible the placing of a tire in a mold smaller than itself that use was made of it in the retreading art. We have recounted the advantages of the method; it facilitated the recapping of tires and eliminated distortion of the casing.

Claim 6 called for the removal of the tire from the matrix after vulcanization "by laterally spreading the side walls of the casing at circumferentially spaced points to circumferentially contract the crown portion thereof out of engagement with the mold." This claim described a method of removing a tire from a mold which is as new in conception as that for placing it therein. The record indicates that in the original practice, hooks and hydraulic machinery were used which tended to damage the tire. Hawkinson spread the sidewalls and used the inherent tension of the casing to contract the crown portion sufficiently to withdraw it from engagement with the molds.

We think that Claims 1 and 6 of the Reissue patent were valid.

■ The District Court held that the claims in issue, to wit, Claim No. 1 of the apparatus patent and Claims 1 and 6 of the method patent were invalid because Hawkinson did not "particularly point out and distinctly claim the part, improvement or combination, which he claims as his invention. * * *" See Title 35, ch. 2, Sec. 33 U.S.C.A. We cannot agree with this conclusion. The claims of a patent are always to be interpreted in the light of its specifications and drawings. This canon of construction is as old as the patent law itself and finds its latest pronouncement in Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132. The District Court did not in its findings point out the particular feature or lack of feature in the specifications which subjected the claims to uncertainty.

The findings recite that "Reading the description of the device and method as set out in the respective claims, together with the specifications and the general statements contained in the applications, there is still left a 'zone of uncertainty' as to the particular features of the apparatus and method which the applicant claimed to be his discovery or invention."

■ In determining the sufficiency of these patents the real test is, whether the disclosures in the specifications and claims make the inventions clear to a mechanic skilled in the art of tire retreading so that he could construct the apparatus and practice the method. Eibel Co. v. Paper Co., 261 U.S. 45, 65, 43 S.Ct. 322, 67 L.Ed. 523. That this was done is conclusively shown by the tremendous success of the patents, not only in this country, but throughout the British Empire.

■ As indicated at the outset, we have not been aided in our examination of the record either by brief or by argument of counsel for appellee, but we find nothing that indicates a fatal lack of compliance with Title 35, ch. 2, Sec. 33, U.S.C.A. The presumptions of validity arising from the grants are not negatived. We are not authorized to strike down a patent for uncertainty and indefiniteness where a reasonable construction of the specifications and claims will protect the invention. Cleveland Automatic Mach. Co. v. National Acme Co., 6 Cir., 52 F.2d 769, 771. Laying to one side any other construction, we are reasonably satisfied that the patents here involved are sufficiently described and claimed.

We are aware that both these apparatus and method patents have been before various courts with varying results, but the claims in issue here were not involved therein and we feel free therefore to exercise our independent judgment.

*As to Infringement.*

■ The alleged infringing mold of Wilcoxen was cylinder-like and flat in cross-section, had confining flanges on either side and intermediate ribs in the U-shaped form and copper heating tubes on the outside. Wilcoxen admitted his mold was the same as Hawkinson's except that the heating means were applied differently.

In the Hawkinson preferred form the heating coil was applied to the exterior of the mold and had a "spirally downward trend" from the top edge toward the bottom edge of the mold with a major portion of each turn of the piping seated in a different one of the grooves forming the ribs. It had an inlet coupling at the top and at the bottom an adjustable outlet restricting valve. Wilcoxen claimed the heating in the Hawkinson mold was uneven in that the steam had to go through the entire coil before it reached the bottom of the ring. He provided two manifolds of copper tubing on the outside of the mold so that the steam had to travel only half way around it instead of several times, as in Hawkinson. He claimed for his piping a more uniform heating.

The District Court found Wilcoxen's apparatus (and method) substantially identical with Hawkinson's apparatus (and method) and that variations in his device from Hawkinson's were only colorable. This was right. "Neither * * * the separation of one integral part into two, doing precisely or substantially what was done by the single element, will evade a charge of infringement." Nathan v. Howard, 6 Cir., 143 F. 889, 893. Wilcoxen's method of getting tires into and out of the mold was admittedly like that of Hawkinson. The apparatus claim 1 and the method claims 1 and 6 are infringed. Upon the assumption that the patents in issue were valid, the District Court had no difficulty in finding infringement, as indicated in paragraph 4 of the findings of fact.

The decree dismissing the bill is reversed and the case remanded to the District Court with directions to enter a decree in accordance with this opinion.