**REYNOLDS METALS CO. v. SKINNER et al.**
**No. 10475.**

Circuit Court of Appeals, Sixth Circuit.
Feb. 12, 1948.

John H. More, of Cincinnati, Ohio, and W. Lee Helms, of New York City (John H. Clippinger and John H. More, both of Cincinnati, Ohio, and W. Lee Helms, of New York City, on the brief; Taft, Stettinius & Hollister, of Cincinnati, Ohio, and Walter L. Rice, of Richmond, Va., of counsel), for appellant.

Leo Wolford, of Louisville, Ky., and Francis R. Harbison, of Pittsburgh, Pa. (Francis R. Harbison, of Pittsburgh, Pa., and Leo T. Wolford, of Louisville, Ky., on the brief; Bullitt & Middleton, of Louisville, Ky., of counsel), for appellees.

Before SIMONS, ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This is an action to recover additional royalties on sales of extruded aluminum products claimed to be due under a patent assignment agreement.

Three main issues are presented:

(1) Whether the appellant underpaid royalties commencing in June, 1942.

(2) Whether the appellant improperly excluded from sales on which it paid royalties the sales of certain products manufactured by Extruded Metals, Inc., and certain products manufactured by appellant on a horizontal Loewy press.

(3) Whether appellant is required to continue the payment of royalties on the sale of extruded products after September 23, 1943 because it continued to manufacture under appellees' patents or their mechanical equivalents and to use in such manufacture certain unpatented devices installed by appellees in appellant's plant.

The District Court gave judgment for the appellees on all three issues.

The case arises out of the following facts, which are for the most part not in controversy:

The appellee Skinner was employed from 1912 to 1935 at the Aluminum Company of America (hereinafter called Alcoa), where for a number of years he was general foreman of the extrusion department. Appellee Bradley was also an employee of Alcoa, having been for a number of years a die-maker in the extrusion department. On March 2, 1932, patent 1,847,365 was issued to Skinner on an extrusion die called the port hole die.

On October 22, 1935, Skinner and Bradley started an extrusion business at Springdale, Pennsylvania. In 1936 John A. Robertshaw, president of the Robertshaw Thermostat Company (hereinafter called Robertshaw), a wholly-owned subsidiary of the appellant, negotiated with Skinner and Bradley for purchase of their entire operation and for their employment by his company. At that time neither appellant nor Robertshaw had had experience in extrusion methods. $7,500 was paid for the purchase of the plant, and an employment contract and assignment agreement were executed between the parties. The agreement provided that Skinner and Bradley should be employed by Robertshaw until November 1, 1939, at salaries of $350 per month each, and should perform services primarily in the extrusion of metals: that Skinner should assign Robertshaw his patent 1,847,365, and that Skinner and Bradley should thereafter assign to Robertshaw certain additional inventions for which patent applications were pending or about to be made, including any inventions which they might make during the term of the agreement. Robertshaw agreed to pay royalties on sales for each twelve-month period commencing May 1, 1937, at the rate of one per cent of sales not exceeding $1,000,000, embodying the inventions disclosed and claimed in any patent covered by the agreement, and at reduced percentages on annual sales in excess of $1,000,000. A minimum annual royalty of $5,000 was to be paid. The agreement further provided that Robertshaw could terminate its obligations under the contract by giving thirty days' notice, but that in such case it should discontinue the extrusion of metal under and by means of the "processes, patents and devices" of Skinner and Bradley, and should reassign the patents and patent applications.

In November, 1938, Robertshaw assigned the agreements to the appellant, with the consent of Skinner and Bradley. In October, 1939, the Springdale plant was shut down, Skinner was moved to appellant's plant No. 1 in Louisville, Kentucky, where Bradley had already been working on extrusion products, and in 1940 appellant shifted Skinner and Bradley to a new and larger plant in Louisville, known as plant No. 8, in which they generally supervised the layout of the plant for installation and equipment. This plant was taken over by the Defense Plant Corporation in 1940, and appellant operated the plant as agent for the United States Government.

Disagreements arose between appellant and the appellees. Bradley was discharged in May, 1941, and Skinner resigned in July, 1941. On September 23, 1943 the appellant served written notice on Skinner and Bradley terminating the license agreement, and reassigned to them Skinner's original patent and the additional patents which had been issued to Skinner and Bradley during their employment. At the same time the appellant made certain changes in its equipment for the alleged purpose of discontinuing the use of any claims which had been allowed and granted under the Skinner and Bradley patents and continued to produce extruded products. The appellant also continued to use some of the unpatented devices which had been recommended and installed by Skinner and Bradley during their employment.

The parties have stipulated as to the amount of the sales involved in this dispute up to November 20, 1943, and if appellant is obligated to pay one per cent royalty on sales not exceeding $1,000,000 in each month, the judgment on this point is correct.

## The Royalty Contract.

There was delay in starting work at the Springdale plant, and for a considerable period the operations were not financially profitable. As a result, on December 24,

1937, Robertshaw requested that the appellees execute a temporary waiver to May 1, 1939, of the minimum royalties. Skinner and Bradley on the same date wrote a letter to Robertshaw waiving the minimum royalties as requested, stating:

"We further understand that, in accordance with our verbal understanding made with you, in consideration of the waiver of minimum royalties until the date mentioned, we will be paid the actual royalties due under the agreement upon a percentage basis in monthly instalments rather than in annual instalments. We understand that the monthly payments of actual royalties due under the agreement will be, of course, computed on a monthly basis rather than sixty days following the lapse of the annual period, as provided in the agreement.

"Except for the change in modification with regard to the waiver in minimum royalties and the payment of the actual royalties upon a percentage basis in monthly installments, as we have stated herein, our agreement of October 26th, 1936, is not otherwise changed in any respect."
Robertshaw answered:

"We wish to acknowledge receipt of your letter of December 24, 1937.

"The change and modification, as therein set out, is an accurate statement of our verbal understanding with relation to the modification of the agreement of October 26th, 1936, and, in consideration of your waiver until May 1st, 1939 of the payment of minimum royalties as provided in said agreement, we, in turn, agree that the actual royalties, to become due thereunder, shall become due and be computed and paid to you monthly thereafter."

An additional waiver of minimum royalties up to May 1, 1940 was made by Skinner and Bradley at appellant's request in February, 1939, and again the letters exchanged agreed that the royalties should be "computed on a monthly basis."

The original contract provided that the royalties to be paid for each twelve-month period should be one per cent on sales not exceeding $1,000,000; three-fourths of one per cent on sales exceeding $1,000,000 and not exceeding $2,000,000, and one-half of one per cent on sales exceeding $2,000,000. Appellant claims that since the sales in the period in controversy exceeded $1,000,000 in each year the reduced percentage should apply. The District Court gave judgment for $95,000 additional royalties, upon the ground that under the modified contract the one per cent royalty was payable so long as the aggregate sales in any given month did not exceed $1,000,000.

We think the decision of the District Court must be affirmed. Appellant asked for a waiver of the minimum royalties provision of the contract for two full years, thus securing the waiver of an agreement to pay the appellees at least $10,000 royalty during that time. Its request for additional waiver increased the amount relinquished by Skinner and Bradley to $15,000. As a consideration for this waiver appellant agreed that the basis of computation should be changed to a monthly rather than an annual basis. Since the letters expressly provided that the computation should be monthly, the reduced percentage did not become effective unless the sales exceeded $1,000,000 in any given month.

Appellant contends that no change in the percentage rate was contemplated, and that the consideration for the waiver of minimum royalties was merely a change in the time of payment. Appellant's vice-president testified in effect that this was the understanding. But since the appellees were giving up a guaranty of very substantial royalties, it is reasonable to infer, as they contend, that they demanded an actual financial consideration for the waiver, in addition to the shift in the method of payment. Appellant knew nothing about extrusion, and had to begin from the very bottom to develop this business. Skinner and Bradley, with their extensive experience in extrusion and die-making, made it possible for appellant to start operations with second-hand presses which Skinner redesigned and rebuilt at a saving of many thousands of dollars over the cost of new equipment. While appellant attempts to discredit the output of these machines, the production record shows that they did the work, and also shows that Skinner and Bradley put appellant into the extrusion business. For the work they performed the compensation of $350 monthly was moderate in the extreme, and the minimum roy-

alties were doubtless regarded by Skinner and Bradley as a very substantial part of the consideration for the sale of their plant, the use of their patents and for their personal services. Their construction that one per cent royalty was to be paid on all sales as long as they amounted to less than one million dollars in any given month was acquiesced in by appellant for two years, and was contested only when the sales of extruded aluminum products began to skyrocket during the war. Appellant's construction that the supplemental contract provided for payment every month, but computed on an annual basis, requires a holding that the term "computed on a monthly basis" expressly included in the contract, is ambiguous in light of other circumstances. But when an ambiguous term is given a practical interpretation by the parties in the course of their dealings, that interpretation will be applied by the courts. Potter v. Madison Willow Craft Co., 6 Cir., 73 F.2d 406, 408; Franklin Fire Ins. Co. v. Chesapeake & Ohio Ry. Co., 6 Cir., 140 F. 2d 898, 899.

■ We are not impressed with the contention that the auditor and treasurer who approved the payments after some question had been made about them were not the officers authorized to bind the appellant on such matters. The monthly check which was issued in accord with the contention of Skinner and Bradley was the check of the corporation. Since the corporation for two years accepted the appellees' figure of the royalties due, it cannot now justly contend that payments so long continued were a mere oversight.

■ The District Court also was correct in its ruling that appellant is liable for royalties on sales to it of blooms made by Extruded Metals, Inc., and on sales made through Extruded Metals, Inc. Appellant's principal contention on this point is that there was no license between it and Extruded Metals, Inc., and hence it is not liable for royalties upon products made by that company. But the record reveals that appellant entered into an understanding with Extruded Metals which specified definite terms of royalty upon such sales for at least five years. On March 27, 1940, Extruded Metals sent the following letter to the appellant:

"Gentlemen: Pending receipt of an agreement from you relative to the manufacture by us of extruded tubing and tube shapes under the Skinner process, this will confirm agreement made with you and Mr. R. C. Reynolds whereby you have licensed us to manufacture tubing and tubular shapes under the Skinner process for a period of at least five years; we to pay you a royalty of 1¢ net per pound on all tubing and tube shapes shipped by us that were manufactured under the Skinner process.

"Pending your own form of agreement or contract, your acknowledgment hereof will be entirely satisfactory for the time being, I am sure."

On April 11, 1940, appellant answered:

"Gentlemen: This will acknowledge your letter of March 27th with reference to license under the Skinner Patents.

"The proposition as outlined in your letter is in accordance with the understanding reached with Mr. R. S. Reynolds and myself.

"We are asking our Legal Department to draw up an agreement for your signature."

The circumstance that the more formal contract was never executed is immaterial. These letters constituted a license agreement permitting Extruded Metals to manufacture under the Skinner process.

■ Appellant claims that Extruded Metals did not use the Skinner dies. But Bradley, on a visit to the plant of Extruded Metals at Belding, Michigan, saw the workmen making aluminum tubes with Skinner's port hole mandrel die. This evidence is corroborated by appellant's own exhibits. It offered in evidence two dies used by Extruded Metals. One of them was revealed to be impracticable because it had no keyway to hold the tip concentrically. This meant that the tip could not be centralized so that a concentric tube could be secured. The fact that it had been found impracticable was supported by the circumstance that its appearance showed it had probably been in the press but once. The second exhibit was stated by Skinner to be "a reduplication of our port hole or mandrel die." He also said, describing the appearance of the die

in detail, "an awfully large amount of tonnage has been run over this die." This testimony was not rebutted. Also appellant arranged with Extruded Metals to extrude rough tubes or "blooms," which were shipped to Louisville and finished in appellant's Louisville plants. Appellant paid royalties to Skinner and Bradley upon this production until January, 1942, at which time it first claimed a deduction of all such sales of the Extruded Metals' blooms. The deduction was protested by Skinner and Bradley. Appellant's long-continued payment of these royalties weighs heavily against its contentions here. Cf. Potter v. Madison Willow Craft Co., supra.

The District Court also found that appellant entered into an arrangement with Extruded Metals to fabricate certain orders under the Skinner process, which it carried out, shipping the orders to the customers. The customers were billed by appellant, which remitted the proceeds collected less a deduction of five per cent, and the court held appellant liable on these sales. As to the Extruded Metals items, the judgment is clearly correct.

Affirmance is also required as to the Loewy press item. The use of the Skinner die assembly on this press was established not only by the appellees, but by a disinterested witness. The foreman of appellant's press department, from the fall of 1942 until October, 1944, testified that the Skinner assembly was used on the Loewy 2,200 press "continually" during the entire period up to 1944.

Use of the Skinner and Bradley Patents.

The contract provided that Robertshaw might terminate its obligation to pay royalty at any time by discontinuing the extrusion of metals under and by means of the "processes, patents and devices" of Skinner and Bradley. It also required Robertshaw to reassign to Skinner and Bradley all patents and applications theretofore assigned to Robertshaw. All of Robertshaw's rights and obligations under the contract having been assigned to appellant, Robertshaw and appellant, on or about September 23, 1943, delivered a notice of termination and a reassignment of patent rights. The District Court found that appellant continued the extrusion of metals after September 23, 1943, and did not discontinue the extrusion under and by means of the processes, patents and devices of Skinner and Bradley, including Skinner patent 1,847,365, for the Skinner die or its equivalent; the tapered die and die assembly, and the die manipulator covered by Skinner and Bradley patent 2,176,-364; the vertical press assembly covered by Skinner and Bradley patent 2,176,365, and ordered an accounting on the production covered by these patents subsequent to September 23, 1943.

Appellant contends that the judgment is erroneous as to all three patents in that the District Court erred in applying the doctrine of equivalents. It urges that many elements of these patents are shown in the prior art. In effect it contends that the patents are invalid, and it claims that the court did not consider the claims in the light of limitations made by the patentees in frame, structure and function, particularly when made to overcome rejection by the Patent Office. It relies upon the file wrapper history of the various patents which reveals the usual course of citations by the examiner of prior art patents, and rewriting of the claims in order to secure allowance. Under the rule of Dillon Pulley Co. v. McEachran, 6 Cir., 69 F.2d 144, appellant therefore urges that the judgment must be reversed.

Appellant, after termination of the contract, altered certain features of the patented devices which it still continued to use. Instead of using the free-hanging feature of patent 2,176,365, upon three vertical presses, it employed a cable to pull the extruded product from the press, which it claims it took from the prior art Shirk patent, 1,924,294. Upon one vertical press it employed the inclined deflector of Wefing, 2,023,776. It closed one die pocket of the die holding slide device of patent 2,176,-364, and did not use it at all. It concedes that it made these changes under the advice of counsel, with the deliberate intent of avoiding the Skinner and Bradley inventions and relieving itself of the obligations of the contract.

We think the District Court was correct in its ruling upon this point. The controversy involves not a question of infringe-

ment, but a question of royalties due under a contract. Technical considerations of patent law are therefore not controlling. Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, 596. Appellant's contentions as to the non-validity of the patents involved cannot be considered, for neither a licensee nor an assignee may dispute the validity of the patent in a suit for royalty. Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., 6 Cir., 110 F.2d 192; United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492. As recently pointed out in a dissenting opinion by Mr. Justice Frankfurter in MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 409, 67 S.Ct. 421, 424, this rule has never been questioned. The appellant is liable for royalties irrespective of the validity of the claims so long as they have not been held invalid, and irrespective of whether or not certain features of the invention may be found in the prior art. The controlling issue is whether the machines, devices and methods used after September 23, 1943, fell within the scope of the contract. Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 586, 26 S.Ct. 150, 152, 50 L.Ed. 317. As there stated by Mr. Justice Holmes: "The real questions in the case are whether the first mentioned Morrow device and the subsequent E 10 fall within the scope of the contract, and these questions depend more upon a careful construction of that instrument than upon nice discriminations between the patents that were or might have been issued. If either of the contrivances used embodies the invention described in Farrow's applications, then the defendant is bound to account for it by the express terms of its covenant, unless the contract is at an end. It is argued that the contract is at an end, that there was a total failure of consideration, because, it is said, there was no invention disclosed by Farrow. In answer to this it is enough to say that, although patents were refused upon some of his claims irrespective of any fault of the defendant, others were allowed, and there was no such final adverse action of the Patent Office upon either application as a whole, as to exonerate the defendant by the terms of the agreement which we have recited. An appreciable part of Farrow's

supposed invention was upheld and remained in the defendant's hands."

Since the issue is not one of infringement, we are not concerned with the prior art. Carbo-Frost, Inc. v. Pure Carbonic, Inc., 8 Cir., 103 F.2d 210, 223, and the rules announced in infringement cases such as Scott Paper Co. v. Marcalus Mfg. Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, have no bearing here.

The case is before us on the applications, drawings and specifications which reveal the inventive conceptions not limited by the rules applicable in infringement cases. Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., supra.

Appellant contends in effect that only claim 4 of patent 2,176,365 is before us. This claim discloses the free-hanging feature of the Skinner extrusion by which the extruded product is subjected to tension through the force of gravity. Since either the cable of Shirk or the inclined deflector of Wefing had been substituted for this feature in all of the vertical presses prior to September 23, 1943, appellant declares that it has not used the Skinner invention after that date. But the entire disclosure of the applications and drawings are covered by the contract as well as the claims. Moreover, the various Skinner and Bradley patents open up a new field, that of the extrusion of aluminum products, and are entitled to a liberal construction as to equivalents.

We think the cable pull and the inclined deflector were not equivalents of the free-hanging feature of the Skinner extrusion mill. Neither of them accomplishes the result disclosed by claim 4. As pointed out both in the file wrapper and in the testimony, distortion of the work is increased rather than inhibited by the use of the Wefing deflector or the Shirk cable pull, for the metal moving from the mouth of the extruding die is not subject to a uniform tension as it is when the extruded article is permitted to hang freely.

But this circumstance has only an incidental and noncontrolling connection with this phase of the problem. The disclosure of the application for patent 2,176,365 is an extrusion mill assembly composed of a ver-

tical hydraulic press operating on a two-story levels. The two-story feature of the device is stressed in the specification as being novel and patentable. The particular organization of the mill was described at length in the specification and given in detail in the drawings. Its advantages were emphasized by appellant's patent attorneys in the Patent Office proceedings.

Numerous methods of operation and details of apparatus separate and distinct from the free-hanging feature of claim 4 are set forth in the specification. All of these features in combination constitute as to patent 2,176,365, the "inventions, processes and patents" of Skinner and Bradley covered by the contract. After September 23, 1943, an "appreciable part of the invention" disclosed by this patent remained in the appellant's hands and was employed by it. Cf. Eclipse Bicycle Co. v. Farrow, supra. This was true even though the disclosure of claim 4 was eliminated by the substitution described, and even though the appellees conceded that the conveyor and vertical stretcher features of this patent had never been installed and that claims 1, 2 and 3 were not involved. The four vertical presses equipped with the cable and the inclined deflector were stated by appellant's extrusion manager to have been "all built and designed by Skinner and Bradley." He also states that they were all operated for substantial periods of time after September 23, 1943. It is found by the District Court and not denied, that the mill assembly was used. Since appellant used the Skinner extrusion mill after the critical date, the District Court correctly held it liable for royalties upon the use.

Similar considerations, which may be more briefly stated, apply to appellant's use after September 23, 1943, of patents 1,-847,365 and 2,176,365. As to 1,847,365, for the port hole die, since the claims have not been held void by any court, the prior existence of the French patent to Lepan, 8282, and the patent to Dick, 715,358, for lead extrusion and copper extrusion respectively are irrelevant to the controversy except as they illuminate the scope of the patent. Both Dick and Lepan are not shown to have been used for the extrusion of aluminum. Since aluminum is subjected in these processes to heat in the neighborhood of 600 to 1100 degrees Fahrenheit, and to pressure of 100,000 pounds per square inch and upward, the necessities of aluminum extrusion are sharply differentiated from those of lead and copper. The record shows that the port hole die or its equivalent was used by appellant after termination of the contract.

The annular ring or mixing chamber of the die assembly shown by this patent is an important element in the Skinner die assembly. This mixing chamber is placed between the mandrel die and the female die. It was a new feature in the building of extrusion dies and of great importance because, among other things, it made possible the building up of pressure in the annular ring to equal the pressure of the mandrel die, thus enabling it to resist the enormous pressure of the plunger and to prevent collapse. Neither Dick nor Lepan disclosed this feature; but die assemblies embodying the annular ring were used in appellant's plant subsequent to the critical date.

The mere non-use of one die pocket of the die holding slide device manifestly does not alter the fact that the device was used. Cf. Paul E. Hawkinson Co. v. Wilcoxen, 6 Cir., 149 F.2d 471, 475.

Moreover, substantial testimony reveals that the tapered dieholder of Skinner and Bradley was used on all vertical presses except the 1100-ton press after the critical date. This was shown not only by Skinner, but by appellant's manager who stated that the work generally at Reynolds is with the tapered die; that it has been so at all times, and still is today.

Use of Unpatented Devices.

 As to the unpatented items installed in appellant's plant by Skinner and Bradley and used by appellant after September 23, 1943, the District Court made the following finding:

"Reynolds continued the use of the following processes and/or devices of Skinner and Bradley, installed or disclosed to it by Skinner and Bradley for the extrusion of metals in its operations on and after September 23, 1943:

Oiling device on draw benches

Twister device and stretcher straightener

Adjustable draw tie

Rolls for straightening out of shape mouldings

Spiral milling cutters

Work drawings showing bearings on extrusion dies

Work drawings showing shrinkage tolerances

Design for heat treating electric furnace

Lot ticket system

Swedging tube pointing dies

Hammer tube pointing dies

Shape design stretcher jaws

One man operated draw bench"

The court declared upon this point: "In order for the defendant to terminate its obligation to pay royalties under its contract with the plaintiffs it was necessary that it not only reassign the patents to the plaintiffs but also that it discontinue the extrusion of metals under and by means of 'the processes, patents and devices' of the plaintiffs. The finding is that the defendant has not done this. It attempted to avoid use of the patents by adopting what the Court has found to be merely mechanical equivalents. They were still in use long after September 23, 1943 when it gave its notice of termination. Regardless of the correctness of that ruling the defendant continued to use after the notice of termination some thirteen of the 'processes' and 'devices' which the plaintiffs had installed in setting up and operating defendant's plant. Defendant's contention that these were not patentable, because of anticipation in the art, and, accordingly could be used by it without liability, does not, even if so established, meet the issue. The contract referred to both patents and to processes and devices. Processes and devices are not necessarily patentable. The long experience of the plaintiffs enabled the defendant to efficiently equip its plant by the installation and use of several processes and devices, which although not patentable by the plaintiffs, yet were valuable additions to the equipment being installed. Under the contract in question the defendant bought this experience and is required to continue to pay for it as long as it uses it. The business world is filled with examples of efficiency experts in particular types of businesses commanding large compensation by utilization of their experience and ideas, although nothing of a patentable nature is involved. The plaintiffs herein appear to me to have occupied a similar position. They are entitled to the commissions provided by the contract on the covered production subsequent to September 23, 1943. The judgment should provide for such an accounting."

We think this conclusion of law is in part erroneous. It is based upon the provision in the original contract that "The party of the second part may terminate its obligation to pay royalty hereunder at any time by discontinuing the extrusion of metals under and by means of the processes, patents and devices" of Skinner and Bradley. It is to be observed that this provision of the contract did not cover the buying of experience, but the use of specific tools, processes and patents belonging to Skinner and Bradley. The buying of experience was covered in that part of the contract which hired the appellees at a specific salary for five years, and also awarded them a substantial royalty, including a considerable minimum royalty on the proceeds of their patents. The appellant is not required to pay for Skinner and Bradley's experience after their relations are terminated, except in accordance with the contract. Their know-how and experience are embodied in the entire arrangement and installation of plant No. 8, but no one would contend that the appellant is required to pay royalties upon the use of that structure after September 23, 1943.

An inventor may have a property right in unpatented devices or a manufacturer in processes which he has originated. A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531. But the processes and methods covered in that case had been developed by the claimant and made its own either by inclusion of special elements or special combinations. They were not the property of the world at large.

Men who have knowledge of a certain art cannot collect royalty for the use of unpatented devices known to and used in the trade merely because of their know-how.

They must have conceived, invented or developed the devices or processes in order to be entitled to compensation for their use. Otherwise the monopoly of the patent law would be extended with disastrous effect. As we construe it, the contract in this immediate provision does not cover any tools, methods or processes which Skinner and Bradley did not originate or so substantially improve that they became invested with their ownership. Otherwise construed, we think the contract would be void as against public policy.

 Applying these principles to the detailed finding, we think it should be affirmed with certain modifications. As to the adjustable draw die, the rolls for straightening tubes, and the twister device, the record does not sustain the inclusion of these in the accounting. The findings of the District Court, if supported by the record, are binding here; but there is no substantial evidence that these devices belonged to the appellees. The adjustable draw die used was not Bradley's, but was one designed by Benecke. Appellant's witnesses claimed, and Bradley admits the prior use at Alcoa of both the adjustable draw die and the rolls for straightening. The twister device had prior use at Alcoa, and is not specifically claimed by Bradley or Skinner.

The two items of work drawings were neither identified nor shown to be original with Skinner and Bradley, nor to relate to work original with them. It was not testified that any such drawings were used by appellant after termination of the contract. The processes employed in any efficient industry commonly require work drawings. Here drawings showing the bearings on extrusion dies and shrinkage tolerances were required to be made in the ordinary course of appellant's operations. It was part of the usual work of Skinner and Bradley to make such drawings. These drawings belong to the appellant, and appellees are not entitled to royalties on their use.

The lot-ticket system and the hammer type-pointing dies were in prior use at Alcoa. The same is true of the shape design stretcher jaws.

It follows that the accounting upon the items above specified should have been refused.

The judgment is modified to deny an accounting upon the use of the adjustable draw die, the rolls for straightening tubes, the twister device, the two sets of work drawings, the lot-ticket system, the hammer type-pointing dies, and the shape design stretcher jaws. As so modified, the judgment of the District Court is affirmed.