SKINNER et al. v. DOW CHEMICAL CO., Inc.

No. 724.

United States District Court
E. D. Michigan, N. D.

April 6, 1950.

Clarence B. Zewadski, Whittemore, Hulbert & Belknap, Detroit, Mich., William M. Yates, Midland, Mich., for plaintiff.

William M. Parmelee, Pittsburgh, Pa., for defendant.

PICARD, District Judge.

The patent involved in this suit was discussed by the Sixth Circuit Court of Appeals in Reynolds Metals Co. v. Skinner, 166 F.2d 66. While the issues were not the same, there is much in Judge Allen's opinion that illuminates the questions presented by this case and indicates that the court had under observance many of the points that are of moment herein.

### Statement of Facts

Plaintiffs are the owners of patent 1,847,365—a combination die cylinder and plunger for the extrusion of hollow metal sections while in a solid, though heated, state, chiefly used (though not limited by the patent) for aluminum and magnesium.

The patent, granted March 1, 1932, has now expired, but was alive at the date of the filing of the complaint, February 21, 1949.

Defendant is The Dow Chemical Company of Midland, Michigan, which it is alleged has infringed the Skinner patent.

Prior to the Skinner patent hollow aluminum tubes were produced by the heating of hollow billets placed in an extrusion cylinder upon which enormous pressure was exerted to force the substance through the orifice of the female die around a mandrel which also moved along the cylinder and projected through the opening of the female die. The mandrel was movable or flexible and the result was a tube of a low degree of accuracy. By this, the only known method, it was almost impossible to get a tube of aluminum or magnesium with an internal diameter of less than about 1⅜ inches. So in order to obtain greater accuracy and tubes of smaller diameter it was necessary to draw tube blooms many times and this called for costly heat treatments in the annealing furnace.

It was a two-step process, expensive, inaccurate, time-consuming and shapes of the final product were limited. It was not denied that this old method could not produce a complex hollow section and that these involved an even more complicated procedure.

Skinner, the inventor, one of the plaintiffs, started in 1912 as a laborer in the employ of Aluminum Company of America at New Kensington, Pennsylvania, later becoming shop foreman in the extrusion department. Alcoa, trade name for Aluminum Company of America, was and is the largest extruder of aluminum products in the world. It has a research department of highly trained and capable engineers. It extrudes all sorts of solid and hollow sections and up to the time of the Skinner patent used the two-step process, first making a tube bloom which was later worked on a draw bench for accuracy. While in the employ of Alcoa, plaintiff conceived the idea of a fixed mandrel die and on March 25, 1930, filed application on which the patent of March 1, 1932, was granted. Skinner was convinced that he could make hollow sections of aluminum or magnesium of any size, shape and in great lengths with a very high degree of dimensional accuracy.

To describe the mechanism more minutely. It comprises of a hollow extrusion, a female die having a major diameter cylindrical opening which is cylindrical in the sense that the walls of the opening are parallel instead of being conical or cone shape. The mandrel die abuts or rests against the face of the female die and the mandrel has a large cylindrical opening concentric therewith. This forms an annular chamber or mixing chamber which is concentric with the opening in the female die. The mandrel is centrally arranged intergral with the side wall and is concave at the base so that the metal is forced along through by the plunger cylinder into the wider chamber where the female fits into the male part of the die and is held in place as fixed—not floating.

When Skinner was ready he attempted to enlist the interest of certain high officials of Alcoa, but was given what he called "the brush-off." He made his first die by hand in 1930 with the help of the co-plaintiff, who now has an interest in the patent, and again endeavored to gain attention of officials of Alcoa, even to the extent of offering to pay the cost of a trial if the experiment did not prove successful. No results. After receiving his patent H. Stevenson, Alcoa vice-president in charge of operations, asked Skinner if he could extrude three hollow shapes by means of the patented die. He said he could and he did. Following this demonstration, Stevenson offered plaintiff $1500 for his patent, which plaintiff refused and thereafter in June, 1935, was obliged to quit Alcoa because he said they made things "too miserable for him."

Being limited in funds he entered into a contract with the Robertshaw Company which later became a part of the Reynolds Metal Company and which contract formed the basis of the suit covered in detail in Reynolds Metals Co. v. Skinner, 6 Cir., 166 F.2d 66.

Defendant is alleged to have started infringing in 1939 but plaintiffs only heard about defendant's operation indirectly in 1941; then after winning their Reynolds Metals Co. v. Skinner Court of Appeals suit in 1948, which brought reassignment of the Skinner patent back to them, they gave Dow notice of infringement on January 11, 1949, starting suit a month thereafter.

Defendant claims that the Skinner patent is anticipated and covered by the prior art and that neither of defendant's dies infringe, chiefly because the Dow dies follow the prior art but use four and six radial webs to support the mandrel, and that if plaintiffs' invention escapes the prior art it is hedged in and restricted by limitations in its claims.

## Conclusions of Law

We cannot follow the reasoning nor contentions of defendant. To begin with here we have two industrial giants of the aluminum and magnesium fields, Alcoa and Dow, each with almost unlimited sources of research, finances, and avenues of information but nevertheless unable, for forty years, to produce a hollow aluminum or magnesium tube except by a two-process method that was expensive, time-consuming and inaccurate. Then comes the Skinner patent and what the trade was apparently begging for but couldn't get, becomes a reality—not through Skinner dies but through other dies using Skinner features and theories. Suit follows and when the alleged infringer is brought into court, its chief defense is that the method it now uses but didn't use before, is one hundred years old according to the prior art.

Those facts alone should cause this court to alert its antennae to discern and record just what the prior art does show.

And what we find is:

The prior art does not anticipate this invention. In fact, if Skinner had known about the prior art he probably would have been discouraged. What he was trying to do couldn't be done. The prior art proved this as a fact.

But Skinner didn't know about the prior art or was too unintelligent to appreciate what it all meant. So having no prior art inhibitions, he perserved and accomplished the seemingly impossible.

He then tried to interest his own bosses but failed and now is faced with loss of the fruits of his labor because of a ninety year old patent that certainly the research departments of both Alcoa and Dow would have found long before, would have used had it been practical to do so, or if not practical in its then state could have been made usable, unless—and this is nearer the fact—the prior art obfuscated the possibilities or failed to meet the challenge.

■ Skinner had, to use a phrase familiar in patent law, "the spark of genius" that was denied others of the extrusion industry. It was not until after his patent, with the fixed mandrel die, was issued and demonstrated that aluminum and magnesium plants throughout the country began using the same theory. This happening or this coming may have been a coincidence or it may be that mental telepathy was functioning with amazing efficiency at that particular time, but the rule of law nevertheless is that the wide use of a man's brain child shortly after the patent is issued is at least evidence of novelty and of invention. See Consolidated Safety Valve Co. v. Crosby Steam-Gauge & Valve Co., 113 U.S. 157, 179, 5 S.Ct. 513, 525, 28 L.Ed. 939: "When the ideas necessary to success are made known, and a structure, embodying those ideas, is given to the world, it is easy for the skillful mechanic to vary the form of mechanism which is equivalent, and is, therefore, in a case of this kind, an infringement."

We consider first the question of infringement since defendant admits that there is some similarity between its dies and that of plaintiffs. It insists, however, that there is no infringement, pointing out among other things that there is only a single supporting arm or web in the Skinner patent while the Dow has six in the port-hole and four in its spider die. It contends further

that this is important because plaintiff's claims are limited.

I do not consider these differences very material and am reminded of what the court stated in National Battery Co. v. Richardson Co., 6 Cir., 63 F.2d 289, 292, that the defendant " 'has paid it (the patent) the tribute of extremely close, if not absolute, imitation.' "

■ In this court's opinion the Dow dies either purposely or by chance result in a circumvention of the Skinner patent and as Judge Allen said in Reynolds Metals Co. v. Skinner, supra, " * * * the various Skinner and Bradley patents open up a new field, that of the extrusion of aluminum products, and are entitled to a liberal construction as to equivalents." [166 F.2d 73.]

As plaintiffs put it, it is rare indeed when an intentional infringer exactly copies the patented article. Usually he wants to utilize the patented idea but he wants to pretend that he has introduced something different so that difference must be analyzed to see whether it is real or superficial. Whether Dow intended to infringe is not material. If it did infringe a valid patent, that is sufficient. Defendant's own witnesses agreed that it makes absolutely no difference in operation whether you have one web or four webs. The only question is are they sufficiently rigid and strong, and when asked whether it was a question of "getting strength" defendant's witness, Mr. Brush, said "No, it's a matter of choice."

Let us further analyze the Dow dies that have four and six radial connections and we find that this is the only difference. They do not follow the Lepan funnel-like or conical opening. They follow Skinner. The ends of the webs of the Dow spider die and the ends of the Dow port-hole die abut against the female die as in Skinner. There is a cylindrical opening which is concentric with the opening in the female die and it is of larger dimension than the female die as in Skinner. The opening forming the mixing chamber flares outwardly in the spider die through the V-shaped grooves in the periphery of the die to register with the walls of the plunger cylinder, as in Skinner

and in the port-hole die the opening is similarly flared to communicate with the port holes. The extruded metal in both of defendant's dies slides lengthwise and is also guided radially down into the mixing chamber, as in Skinner. Taking element for element, although the appearance of the structure is different the parts of the Dow dies are as defined in the Skinner die. Both Dow dies operate the same as the Skinner die to produce the same results and differ from Hanson in the same way that Skinner differs.

In Hobbs v. Beach, 180 U.S. 383, 401, 21 S.Ct. 409, 416, 45 L.Ed. 586 the court said: "As the two machines are alike in their functions, combination, and elements, it is unnecessary to go further and inquire whether they are alike or unlike in their details."

See also E. H. Bardes Range and Foundry Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, 698: "Except where form is of the essence of the invention, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result,' * * * and mere colorable departures do not avoid infringment."

■ We find that the Dow dies are only immaterial variants of Skinner and that there has been an infringement. A patentee is not limited to the specific embodiment of the invention which is shown in his patent and the force and effect of the patent is not curtailed by minor subordinate differences. Paper Bag Case (Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122. See Winans v. Denmead, 15 How. 330, page 342, 56 U.S. 330, page 342, 14 L.Ed. 717, and Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, where the court said: "Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

On this point defendant may contend that the same argument could be made in favor of the Hanson patent and against the Skinner patent, but neither Hanson nor any of its alleged offspring could actually get results without copying important essentials from Skinner.

For example the Schwerak die that was brought out by Bohn Aluminum and presented to Dow didn't work. As a matter of fact, as stated above, Dow couldn't make it work until after it had added the features stressed in the Skinner die.

■ As to defendant's contention that Skinner is limited by its claim, we cite the well recognized rule that an amended claim is entitled to cover equivalents so long as the amended claim is not thereby expanded to avoid the express limitations inserted to secure the patent.

In Hubbell v. United States, 179 U.S. 77, page 80, 21 S.Ct. 24, page 25, 45 L.Ed. 95, the Supreme Court said: "While not allowed to revive a rejected claim by a broad construction of the claim allowed, yet the patentee is entitled to a fair construction of the terms of his claim as actually granted."

In Weber Electric Co. v. Union Electric Co., D.C., 226 F. 482, page 485, the District Court stated the law as follows: "Having yielded to the pressure of the Patent Office, the claim will be confined to the limitation imposed by the amendment; but this is as far as the estoppel goes."

In Angelus Sanitary Can Machine Co. v. Wilson, 9 Cir., 7 F.2d 314, page 318, the Circuit Court for the Ninth Circuit said: "* * * nor is he estopped from claiming by the amended claim every improvement and combination which he has invented and which was not disclosed by those references."

■ We come to the question of validity and prior art bearing in mind that under the decisions the burden of proving invalidity is upon the infringer. Walker on Patents, Dellers Edition, Vol. 2, page 1273, section 276 states: "A presumption of validity follows from the issuance of a patent, and the burden is on the person alleging invalidity to establish it. * * * The presumption can be overcome only by clear and satisfactory proof."

See also Coffin v. Ogden, 18 Wall. 121, 124, 85 U.S. 120, 124, 21 L.Ed. 821.

There was a general acceptance of the Skinner disclosure to such an extent that the defendant in the year 1944 extruded as high as four to eight hundred thousand pounds a month of magnesium tubing and replaced practically all its equipment recently by over one million dollars to use dies that plaintiffs claim now infringe their patent.

■ The court in Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, at page 61 states: "And if there be doubt as to whether the device should be treated as an invention, or as a mere mechanical improvement, this doubt should be resolved in favor of the validity of the patent, in view of the fact that it filled a recognized need in the industry, that it came immediately into extensive use, and that the Patent Office has issued a patent covering it."

See also National Battery Co. v. Richardson Co., supra, 63 F.2d at page 292—" 'The need existed for many years, but was not theretofore met. * * * This is indicative of the fact that more than mere mechanical ability was required to conceive the invention and reduce it to practice.' "

Let us examine the patents.

## The Schwerak Patent

■ Plaintiffs claim that they notified Bohn Aluminum & Brass Company in Detroit about their patent by letter in 1933 or thereabouts. Bohn Aluminum found no such letter but it developed that in 1935 Bohn Aluminum Company came out with the Schwerak patent and Dow followed soon after. Admittedly the Schwerak die did not work and has never been used commercially. But it only faintly resembles the Dow dies and even if the Dow dies were patterned after Schwerak it still infringes the earlier Skinner patent. Hoyt v. Horne, 145 U.S. 302, 12 S.Ct. 922, 36 L.Ed. 713. As stated in Walker on Patents, Dellers Edition, Vol. 3, page 1691, section

459—"One who appropriates and manufactures or uses a patented invention or substance thereof without the consent of the patentee does not escape or avoid infringement by improving upon the invention, or using an improvement made by another."

## Lepan Patent

Defendant's claim that the Skinner patent is similar to Lepan No. 8282 French patent issued in 1852, is without merit. The Lepan patent was cited by the patent office as against the Skinner application and claims thereafter allowed. This presents a strong presumption that Skinner defined patentable subject matter over Lepan. See Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 6 Cir., 48 F.2d 73. But there are many other differences. While the Lepan patent designs a fixed mandrel, the chamber through which the metal is forced is funnel-like and the metal (molten) goes directly into the funnel-shaped opening of the female die. In plaintiff's patent the metal is in a solid state; its path of plastic flow under pressure to the extrusion die is impeded, so that it must fill and bond together in the mixing chamber before it finally extrudes as a tube around the mandrel and through the opening of the female die. This resistance or impedance to flow is asserted to be of great significance and it is used in both Dow dies. It is brought about by a combination of mold contours including a "shoulder" formed by the flat contact surface of the female die around the extrusion opening.

No such shoulder is provided in Lepan, and Lepan has no mixing chamber as such.

Here is another important difference. Lepan's die is designed to facilitate the flow of the metal while Skinner's is designed to obstruct, and the Lepan patents have no annular ring which makes possible the building up of pressure therein to equal the pressure of the mandrel die enabling it to resist the enormous pressure of the plunger and prevent collapse. See Reynolds Metals Co. v. Skinner, supra.

## Dick and German Patents

The Dick and German patents are very similar and the Royle patent I do not consider because it is not for the extrusion of metals. It has also, many objections of the Hanson patent. In the German and Dick patents the legs of the mandrel do not meet the female die and this is described by all the witnesses as essential. The metal is not obstructed but runs through smoothly as in the Lepan patent. The mixing chamber is conical and not cylindrical and the female die is not cylindrical as required by the Skinner claims. As a matter of fact while all patents in the prior art back to over ninety years ago, have some features of the Skinner patent, no other prior art has them all or any equivalent. You must go from one patent to another. It was Skinner who discovered the combination and the changes made by plaintiffs were evidently not insignificant. Probably the most appropriate statement on the effect of this is found in The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co.), 143 U.S. 275, at page 283, 12 S.Ct. 443, at page 446, 36 L.Ed. 154, where the court said: "In the law of patents it is the last step that wins."

## Hanson Patents

There were three Hanson patents. The first No. 7427 in 1837 was British. Hanson took out a patent in the United States in March 1841, No. 2021 and that was reissued later in 1846, No. 82.

Both, plaintiff's and the expert witness for defendant, Mr. Brush, agree that in the prior art the Hanson is the most relevant and pertinent and it is necessary to learn just what change or modification makes the Skinner die commercially useful but is lacking in the Hanson patent. In short, what evidently destined the Hanson die to remain as just another extrusion die for lead and similar soft metals.

This is soon apparent for although the Hanson patents cover both a floating and fixed mandrels, in all the Hanson patents we find that the metal is "encouraged" to flow easily toward the aperture (page 2 Hanson's 82 Col. 1—lines 8 and 9 from the bottom) while in the Skinner die the flowing metal covers a course designed to promote "friction." This is important and the Skin-

ner mandrel die bears against the female die to absolutely define the mixing chamber, while the Hanson die does not. There is an attempt in the Hanson specifications to cover the deficiency but this is unaccompanied by any drawing and it has been held that mere suggestion is not enough. See Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210 and Canda Bros. v. Michigan Malleable Iron Co., 6 Cir., 124 F. 486. A patent is not necessarily anticipated by a mere suggestion in a prior patent. This is particularly true in the present case because Hanson practically discards the "friction" idea for the "easy flow."

Here again we are reminded that the Schwerak patent available to the defendant in the middle or late thirties, was first patterned after the Hanson and Dick patents, but since it didn't work when actually tested, Schwerak and defendant copied the discoveries evidenced by the Skinner patent of having the outside mandrel supported against the face of the female die, paving the way to utility.

A review of the Skinner and other patents convinces this court that Skinner taught the art several things:

(a) That the mandrel die must be in the form of an integral body in which the central mandrel, the connecting webs and the outer portion are all solidly and separately joined together;

(b) That the end of this body should have a concavity around the tip of the mandrel;

(c) That the outside part of the integral body around this concavity must rest against the female die;

(d) That the opening through the female die must be cylindrical rather than conical or funnel-shape (Hanson and Royle have this also);

(e) That the mixing chamber formed must be cylindrical—that is it must have parallel instead of conical or funnel-like walls;

(f) That the tip of the mandrel must be smaller in diameter than the rear portion so there is a shoulder between the rear portion and the tip (The Hanson patent and Dick's Scientific American Article have this); and

(g) The maximum diameter of the passageway must be greater than the maximum diameter of the mixing chamber.

None of these is apparently insignificant but as stated in Potts v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275, by reference —A change is not insignificant where it revolutionizes an entire industry. And Justice Bradley in Loom Co. v. Higgins, 15 Otto 580, 591, 105 U.S. 580, 591, 26 L.Ed. 1177, aptly stated: "Now that it has succeeded it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit."

It was Skinner, not Hanson or anyone else, who brought out the importance of the fixed mandrel, and the "failure of the earlier to get recognition in the trade may be persuasive evidence that an apparently slight advance was more important than it seems." Republic Iron & Steel Co. v. Youngstown Sheet & Tube Co., 6 Cir., 272 F. 386, at page 390.

 We therefore hold that the Skinner patent is valid; that Dow spider and porthole dies infringe.

### Laches

A further defense submitted is that of laches because plaintiff knew or had good reason to believe back in 1941 that defendant was using the very dies that plaintiffs now claim infringe the Skinner patent, and plaintiffs failed either in writing or verbally to notify defendant to desist, so that defendant would not have gone to the expense that it did and could have refrained from further infringement.

There is no evidence that defendant was lulled into a false sense of security or that it would have stopped using its dies. Even today it insists that it has this right.

The plaintiffs brought suit within a few weeks after they had received back title to the patent and that came as a result of a long law suit. They couldn't have

brought any action previously because the patent had been turned over to the Reynolds people who refused to bring suit against the infringers.

There is no evidence to show that Dow was injured by any delay or relied on the conduct of the plaintiffs. While plaintiffs could possibly in some cases be charged with knowledge through hearsay, by the same reasoning Dow in looking up the Schwerak patent would have found that the Skinner patent was mentioned in the file wrapper. Whatever expense Dow went to was not due to any act of omission or commission by the plaintiffs nor was Dow lured into infringement by the nonaction of plaintiffs or their predecessors. It is stated in 21 C.J. at page 1129: "One relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require. If he conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss he cannot invoke the doctrine of estoppel." See, also, 31 C.J.S., Estoppel, § 71.

Dow either knew of the existence of the Skinner patent or with exercise of reasonable diligence could have known when it first started to make its own port-hole and spider dies. If it didn't know it through the file wrapper or through Bohn, then it should have known it through Graham and Hunt who worked at Reynolds Metals in the extrusion department before going to Dow, where Hunt became foreman in Dow's extrusion department.

The doctrine of laches is said to be highly penal in character and will not be applied when manifestly unequitable. It isn't a question of time and we hold that the doctrine of estoppel and the request for relief on the ground of laches should be and is hereby denied.

A judgment for plaintiffs according to the foregoing opinion will be presented to this court for its signature.