ALPHEUS D. GIBBONS

*v.*

HENRY L. POTTER.

1. A suitor who attempts to overcome his own written admission of a payment, can only succeed by the production of proof sufficient to make the truth of his claim clear.

2. A witness who feigns forgetfulness of circumstances collateral to his main story, which he must recollect if he has any memory at all, and in respect to which he would be open to contradiction if his testimony is untrue, is unworthy of belief.

On final hearing, on bill, answers and proofs.

*Mr. Thomas S. Shafer* and *Mr. William J. Magie*, for complainant.

*Mr. J. H. Stone*, for defendant.

THE VICE-CHANCELLOR.

This case presents simply a question of fact: Did the defendant make a payment of $8,000 on the mortgage in suit in August, 1876 ? The mortgage was given for $14,600,

being part of the purchase-money of a farm conveyed by the complainant to the defendant, and bears date August 1st, 1872, and provides for the payment of the principal sum as follows: $4,400 August 1st, 1874; $3,400 August 1st, 1875; $3,400 August 1st, 1876, and $3,400 August 1st, 1877. On the 1st of August, 1876, $9,300 remained unpaid, being the installment which fell due on that day, and that which would come due August 1st, 1877, and $2,500 of the installment which had fallen due August 1st, 1875. The defendant says he paid the complainant $8,300 about the middle of August, 1876. He produces two receipts, both signed by the complainant, in support of his claim. They bear date August 1st, 1876; one is endorsed on the bond, and the other is a separate paper which passed into the possession of the defendant at the time it was made. It is agreed that they were not made on the day they bear date. The proofs show that the parties met at the house of the complainant about the middle of August, 1876, and that the defendant then passed to the complainant three papers: a note of a person by the name of Robinson, for $250, falling due December 30th, 1876, and which the defendant, and not the drawer, paid; the defendant's own note, payable to the order of the complainant, at four months, for $307; and the defendant's own check or note, at a short day, for $83.40. No endorsement was made on the bond at that time, but a loose receipt was given to the defendant. The Robinson note was payable at a Rahway bank, and was paid there by the defendant, January 2d, 1877. On the next day, or the day following, the defendant again went to the house of the complainant, and the receipts in controversy were then made.

The defendant says his payment consisted of over $8,000 in money, some notes and, he thinks, a small check, but he is unable to give the precise details, while the complainant says not a penny in money was paid, and nothing was delivered to him but the three papers. Deducting the discount, the value of the three papers, on the 1st of August,

1876, was just about sufficient to pay the interest then due, and $300 of the principal. This, the complainant says, was the sum of principal that it was understood was then paid, and nothing more. The loose receipt, given at the time the papers were passed, is not produced. The defendant says he gave it to the complainant at the time the endorsement was made on the bond, but the complainant denies this, and says the defendant destroyed it at that time. Both the receipts were written by the defendant. The complainant swears that they have been altered since he signed them; that he read them before signing, and they then simply acknowledged a payment of $300 of principal, and that the word eighty, making the sum eighty-three hundred dollars, has been added since. Such a change, in the receipt taken ͻy the defendant, was easy enough; and in respect to the one endorsed on the bond, and which remained in his possession, the complainant says that was written and signed first, and after he signed it, he observed that the figures denoting its amount had not been put on, and he handed it back to the defendant to have them added; that, while he was in the act of signing the other or duplicate receipt, he saw the defendant using his pen on the bond, but did not see what he was doing, but supposed, of course, he was adding the figures; that, very shortly afterwards, the defendant handed the bond back, folded up, and, without unfolding it or making any examination of it, he put it away. His theory is, that the defendant made the fraudulent alteration while he had the paper for the purpose of adding the figures.

The receipts unquestionably make a strong case for the defendant, and put upon the complainant the burden of showing that the money was not paid, or that the receipts were altered after they were signed. To be successful on either ground, his proofs must be sufficient to produce strong and clear conviction. I think they fully come up to that standard, and show, with almost absolute certainty, that the money was not paid.

In cases of this kind, the conduct of the chief actors in the transaction generally furnishes sufficient evidence of the truth to show at least in what direction to search for it. Few bad men possess such perfect cunning in the art of deceiving as to be able to make their acts accord naturally with their words in concealing their evil purposes.   The complainant says he first discovered the receipt on the bond was wrong on the last day of January, 1877; he had not examined it before since the endorsement was made, and he happened to look at it then because a half-year's interest was due the next day.   He went at once in pursuit of the defendant; he found him, on the 2d of February, at his own house, and there, in the presence of his wife and son, showed him the bond and told him the receipt was for an untrue amount.   He says the defendant admitted the receipt was wrong, and explained the error by saying he must have been thinking, when he wrote it, of the $83 check.   The complainant says he asked for an immediate correction; that the defendant hesitated a short time, and then said his duplicate receipt was in New York; he would prefer to see that first, but he would get it the next day, and call at the complainant's house in the afternoon and make the correction.   He did not keep his promise.

This was a very important interview.   Its scenes must have made a very deep impression upon the mind of every person present.   The defendant, on his first examination, admitted that the complainant at this time claimed there was an error in the receipt, but, on a subsequent examination, he said if he had said so it was a mistake, for it was not until a later interview that such claim was made.   But his conduct, I think, furnishes very cogent proof of the truth of his first statement; he at once prepared to make a tender of the unpaid balance of the mortgage, though it had not yet fallen due.   As to what transpired at this interview, the complainant's evidence stands not only substantially uncontradicted, but strongly corroborated by the fact that neither the defendant, his wife, nor his son, have

attempted to tell what did occur. All three say they did
not see the bond, nor hear the complainant say anything
about a mistake; but they stop there; neither attempts to
narrate what was said or done. All the way through the
case the defendant has preserved absolute silence as to what
he said when the complainant first claimed that the receipt
admitted the payment of a larger sum than he had paid.
The payment of so large an amount was an event neither
could forget, nor was it possible for such a transaction to
become the subject of confusion or doubt in the mind of
either in so short a time. Both knew, the instant the claim
of mistake was made, whether it was true or false, and the
fact that the defendant does not even pretend that he met it
with any sort of denial, leaves him in a position where his
conduct must be considered as strongly confirmatory of the
truth of the complainant's evidence.

The complainant also says that, after the defendant failed
to keep his promise to call on him, he went in pursuit of
him again, the next morning, and found him on the street.
He says the defendant then stated that he had not got his
receipt the day before, but he would get it that day and call
in the evening; but he again failed to keep his promise.
The next day was Sunday. On Monday the defendant
called, in the complainant's absence, and left word he
should call at his (the defendant's) house the next day. He
says he went early the next morning, when the defendant
produced the duplicate receipt, declared that he had paid
the money and could prove it; that his son at once cried
out that he had seen the money paid, and immediately
thereafter the defendant's wife said she had seen her hus-
band start from home with the money to make the pay-
ment; that thereupon the defendant, and before he (the
complainant) had had an opportunity to utter a word, ten-
dered him $1,035 in payment of the balance of the mort-
gage, and then said that he had already paid all the farm
was worth; its value had been misrepresented to him; and
that, if the complainant would refund what he had paid, he

Gibbons *v.* Potter.

would reconvey the farm. Up to this time, the complainant says he had had no chance to speak, but he now said he could not entertain any proposition of compromise until the mistake was corrected. He says the defendant then advised him not to act hastily, for, if he did, he would only make food for the lawyers. He then left, and on the same day directed this suit to be brought.

The defendant admits the tender; indeed, he sets it up in his answer; but he does not tell what induced him to make it, nor give any of the circumstances leading to it. So far as his evidence gives any light, it was unprovoked and without motive. He says, when the complainant first called, in February, he merely came for his interest; no bond was shown, and nothing was said about a mistake; he says that that subject was first mentioned in a subsequent interview, but he does not say that there was any dispute or disagreement then, nor does he pretend that he denied the complainant's claim. If it was false, the simple impudence of making it would, it seems to me, have appeared so outrageous to the defendant as to have provoked him to strong denial and bitter denunciation. No man with sufficient self-love to protect himself or his property, would permit a claim of this kind to be made against him, being fully conscious of its utter falsity, without instantly denying it and sternly rebuking the effrontery of the person making it. Silence, under such circumstances, can be interpreted in but one way.

The defendant's story is clearly marked by dissimulation throughout. He admits the complainant came to his house when the tender was made, at his request, but he affects to be unable to remember what he said when he made the request. He says: "I may have told him I had some money for him, or I would have something there for him, or I don't know but what he wanted to see the receipt; it is possible I may have told him, if he came, he could see the receipt." Such confusion of recollection was impossible to a man who was conscious he was resisting an unjust pretension founded

14

Gibbons *v.* Potter.

on an impudent falsehood.   Why, if the receipt was true there would have been no reluctance in showing it; it would have been the very first thing produced to confront the complainant, and he would have been challenged at once to gainsay what it asserted.   The defendant's conduct, as portrayed by himself, I think, is a powerful witness against the truth of his story.

An effort has been made to support the defendant's evidence by attempting to show that, at the time the alleged payment was made, he had sufficient money to make it.   He says he derived it from the sale of certain United States coupon bonds which he held at the time of his purchase of the complainant, and which he continued to hold afterwards, although most of his real estate was constantly under mortgage.   His ignorance of how he got the bonds, and of what they consisted, is as profound as it could have been if he had never owned them at all.   He says he obtained them seven or eight years ago, but he cannot remember how many there were, nor of what series they were, nor the sum total of their par value; but he believes it was *about* $7,000.   He does not remember of whom they were purchased, nor at what place (except somewhere in the city of New York), nor who bought them, nor what was given in exchange for them, nor how they were paid for; nor is he certain whether the interest fell due quarterly or semi-annually, though he collected it for seven or eight years.   Such inexplicable ignorance is, in my view, an unmistakable badge of falsehood.   A witness who feigns forgetfulness of the circumstances collateral to his main story, and which he must recollect if he has any memory at all, and in respect to which he would be open to contradiction if his testimony is untrue, is unworthy of belief.   It is barely possible the defendant sold some federal bonds about the time he alleges he made this payment, but the evidence furnished by his own conduct in disproof of the payment is so thoroughly conclusive that, even if that fact could be considered fully proved, his story would still be incapable of belief.

The evidence of the defendant's wife is swept away by force of its own evidence of untrustworthiness. It is painfully manifest that she was controlled, in what she said, by an anxious zeal for her husband's cause, rather than by her recollection or knowledge.

The statement of the defendant's son, that he was present and saw the money paid, is opposed by so strong an array of counter-proof that, notwithstanding the natural inclination of the mind to give credit to the testimony of children, my judgment almost involuntarily rejects his evidence. I cannot believe that his statements are corruptly false, but I think it is highly probable that his memory, under the artful and positive statements of his father, has been so wrought upon as to have unconsciously substituted the occurrences of a prior visit for those of the last.

There are many other circumstances pointing in the same direction. I do not deem it necessary to refer to them further than to say that, with those already mentioned, they leave no doubt in my mind that the payment of $8,000 claimed was not made, and that the receipts to that extent are false.

The last installment of the mortgage having fallen due during the pendency of this suit, the complainant is entitled to a decree for $9,000, with interest from August 1st, 1876. I will so advise.