Complainant, Club Razor Blade Manufacturing Corp., is engaged in the manufacture of razors and razor blades in Newark. Ross Nadeau, an officer and director of the company in the year 1936 conceived the idea of an improved razor blade wrapping machine, by which it was possible, much to the advantage of the company, to manufacture and market low priced razor blades in single wrappers instead of the usual double wrapped blades then in use and thereby eliminate the second or inner wrapper and thus reduce the cost of producing the razor blades. One of the features of his invention was that the machine wrapped blades faster and more efficiently due to continuous movement instead of the intermittent movement present in other wrapping machines then in use by complainant and others. Nadeau assigned his invention to the complainant.
In order to build the machine complainant found it necessary to obtain the services of a competent draftsman to prepare drawings and blue prints embracing the ideas of Nadeau's invention and for that purpose employed the defendant William Bindzsus who, for a considerable length of time under the supervision and instruction of Nadeau proceeded in the manufacturing plant of the complainant to make drawings and blueprints in conformity with Nadeau's idea and invention. It was explained to Bindzsus at the time of his employment that he was to hold secret and confidential the information given to him from time to time from which the drawings and blueprints were to be made by him. Bindzsus worked in the complainant's manufacturing plant separate and apart from others so that what he was doing was guarded.
When the drawings and blueprints were completed the matter of building the machine was discussed by Nadeau and *Page 285 
Bindzsus with Gus Reinke and the Gus Reinke Machinery Tool Company was selected to do the work with the understanding and the assurance of Gus Reinke who was the president of the company and the person actively in charge of the business of the company, that the drawings, blueprints and designs thus prepared would be received and treated in a confidential manner.
The machine was then placed in production and Reinke says that the complainant was represented while the work was going on in the place of business of Gus Reinke Machinery Tool Company by Bindzsus with whom it had no business relations before and did not know until it was engaged to do the work, and that the machine when constructed was delivered to and paid for by the complainant. After the machine was delivered to the complainant, Gus Reinke Machinery Tool Company built four others in the year 1940 for Bindzsus. One of these machines was sold by Bindzsus for $3,000, which sum was divided $1,500 to Bindzsus and the other $1,500 went to Gus Reinke Machinery Tool Company. This machine was sold to the Utility Blade and Razor Company. The other three machines were delivered to various customers and charged to Bindzsus who paid for them. All of the machines were of the same build and character as the one sold to the Utility Blade and Razor Company.
Harry Ritterbusch, assistant professor of mechanical engineering in the Newark College of Engineering, a graduate of Newark College of Engineering and Stevens Institute of Technology, examined the machine sold to the Utility Blade and Razor Company in Cranford, and the machine of complainant, and after testifying at length concerning the comparison which he made of each unit of the machine summarized the same by saying "I found no basic difference. I might point out a slight difference, which does not fundamentally affect the operation of the machine, and that lies in the tripping device, that device which raises your adhesive container. * * * In unit A that rod is on the left and in unit B it is on the right of the link which gives the motion to your adhesive container. * * * Basically and fundamentally, in principle and in mechanical construction, they are the same." *Page 286 
Bindzsus denies that he got any idea from Nadeau while employed by the complainant company for the making of drawings, sketches and blueprints from which the machine in question was finally built. He says that he conceived the idea prior to the time that he became employed by the complainant and while he was in the employ of the Ardell Razor Blade Corporation, and at that time made a sketch in the year 1937. He says that a Mr. Nick Calenda saw the sketch. That when he made the drawings, sketches and blueprints for complainant he did not have the sketch which he made while working for the Ardell Razor Blade Corporation and that he had mislaid it but that when he had the drawings, sketches and blueprints made for the complainant he found the earlier sketch "home in one of my books when I looked up a problem."
Calenda at present is the superintendent for the Ardell Razor Blade Corporation. How he came to see the sketch is described by the witness as follows: "* * * one evening while I was walking through the plant I saw the lights on in the office and I walked into the office and I asked Mr. Bindzsus `What are you doing, Bill? It is after hours. You are supposed to go home at five o'clock.' So he said, `Well, I'____ he hesitated for awhile and then he said, `Well, I might as well tell you, I have been working on an idea of a single wrapping machine.' So he showed me the sketch and at the time I didn't think much of it." The witness says he was the only one who saw it and that the sketch was never submitted to the Ardell Razor Blade Corporation.
I have come to the conclusion that Bindzsus never made any drawing or sketch for the machine in question until the idea underlying the principles upon which it was constructed was brought to his attention by Nadeau. This conclusion is reached from my observation of the witness on the witness stand and his manner of testifying, and from what will appear hereafter herein. Such observations of the witness and his manner of testifying are equally as important in determining where the truth lies as are the words which fell from the lips of the witness. Nor do I believe that Calenda saw in the office of the Ardell Razor Blade Corporation any sketch made *Page 287 
for such a machine in 1937. The witness Calenda testified in a casual sort of way and left with me the impression that he was interested in these proceedings because his company purchased one of the machines. Moreover, if Bindzsus had prepared an earlier sketch involving the same idea it is but reasonable to say that when Nadeau asked him to prepare sketches and drawings in conformity with his idea that Bindzsus would have immediately recalled his former drawing and said to Nadeau "Why this is nothing new. I conceived the same idea sometime ago and I made a sketch. I will look it up and show it to you. There is a man named Calenda to whom I showed this sketch involving this same idea." But he was silent and proceeded with the work. "The defendant's conduct, as portrayed by himself, * * * is a powerful witness against the truth of his story." Gibbons v. Potter,30 N.J. Eq. 204, 210.
Bindzsus had in mind the filching of complainant's invention, for immediately after he was laid off by complainant which was at the end of August, 1939, he applied for letters patent for an improvement in "razor blade wrapping machine," which application was allowed him November 21st, 1939. On cross-examination Bindzsus testified as follows: "Q. You never had any intention to apply for any patent on this as long as you were in the employ of the Club Razor, did you? A. No, really not." He was then asked whether he did not know that the Club Razor intended to apply for a patent, to which he replied in the negative. "Q.
Now, when you got the idea of taking out the patent, it was on the machine which you had built while in the employ of the Club Razor and Blade Company? A. Yes sir." It was stipulated in the cause that no letters patent have been granted on the application of Bindzsus.
It is not open to question that the complainant is entitled to the aid of the court under the facts and circumstances disclosed by the evidence in this case. Complainant's assignor conceived and invented the idea of the improved razor blade wrapping machine in question. It's business is the manufacture of razors and razor blades. One who invents or discovers and keeps secret a process of manufacture, whether *Page 288 
patentable or not, has a property therein which the court will protect against one who, in violation of contract and breach of confidence, undertakes to apply it to his own use or to disclose it to a third person. Salomon v. Hertz, 40 N.J. Eq. 400;2 Atl. Rep. 379.
In Stone v. Goss, 65 N.J. Eq. 756; 55 Atl. Rep. 736, Mr. Justice Swayze, speaking for the Court of Errors and Appeals, said: "The right of a manufacturer, whose goods are made by an unpatented secret process, to protection by injunction against the divulging of his secret in a proper case, is now established by a well-considered line of cases in England and in several states (citing cases). * * * These cases establish the principle that employees of one having a trade secret, who are under an express contract, or a contract implied from their confidential relation to their employer, not to disclose that secret, will be enjoined from divulging the same to the injury of their employer, whether before or after they have left his employ; and that other persons, who induce the employee to disclose the secret, knowing of his contract not to disclose the same, or knowing that his disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making any use of the information so obtained, although they might have reached the same result independently by their own experiments or efforts. We approve the principle thus established."
Vulcan Detinning Co. v. American Can Co. (Court of Errorsand Appeals), 72 N.J. Eq. 387; 67 Atl. Rep. 339, is one where complainant purchased a process for the detinning of tin scrap unknown in this country, the secret of which was carefully guarded. One of complainant's original directors who held in trust the formula of its process, became the president of the defendant corporation, and with the help of certain discharged employees of the complainant, installed for the defendant, as a competitor of the complainant, the process so purchased by the latter. Upon a bill filed to enjoin this inequitable competition, and to restrain the further publication of the complainant's process, the director of complainant was enjoined because of his breach of trust, and the discharged employees of the complainant enjoined under the rule laid down in Stone v. Goss, supra. *Page 289 
In Pomeroy Ink Co. v. Pomeroy, 77 N.J. Eq. 293;78 Atl. Rep. 698, Vice-Chancellor Emery said: "* * * The present case is not one where complainant's right to the use of the formulas and formula notes as against the defendant, depends upon the principle of confidential communication, for as to this feature of the case the defendant, while an officer and manager of the company, was himself the inventor or discoverer of the process and communicated it to the company. But the vital question in the case is whether the defendant, the discoverer or inventor of the processes disclosed by the formulas, transferred to the Pomeroy Brothers Company the exclusive right to the formulas and formula notes, as their property. If so, such transfer is binding on him and passed with the assets of the company to the complainant. No written or express transfer was made or is claimed, but there is no reason why the transfer of such rights may not be based on an implied as well as on an express contract. In Silver Spring,c., Co. v. Wollworth, 19 Atl. Rep. 528, it was determined that, under all the facts in the case, a contract by the discoverer (an employee) for transfer of the right to the employer was implied, and would be enforced; and in Baldwin v.Von Micheroux, 25 N.Y. Supp. 857, it was also held that, under the facts proved, the employers were the owners of the secret processes for flavoring extracts compounded by the employee, although no express contract was proved, and the employee was enjoined from using them. * * *"
Where one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer.Solomons v. United States, 137 U.S. 342, 346; 34 L.Ed. 667,669.
There will be a decree enjoining the defendants in accordance with the prayer of the bill of complaint. *Page 290