*Decision will be entered under Rule 50.*

REDMAN L. TURNER AND NAOMI S. TURNER, PETITIONERS *v.* COMMIS-SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5573-64. Filed January 3, 1967.

*R. T. Baker*, for the petitioners.

*Dennis M. Feeley*, for the respondent.

HOYT, *Judge:* This case involves a deficiency in income tax for the taxable year 1961 amounting to $3,256.75. The sole question for our decision is whether the sum of $13,125, part of a greater amount received by petitioners from Citizens Bank & Trust Co. of Campbellsville, Ky., represented gain from the sale or exchange of a capital asset, or, as respondent has determined, ordinary rental income.

### FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly, with due weight being given to accompanying documentary exhibits.

The petitioners, Redman L. Turner and Naomi S. Turner, husband and wife, reside at 505 North Columbia Avenue, Campbellsville, Ky., and for the taxable year 1961 they filed a joint Federal income tax return with the district director of internal revenue in Louisville, Ky. All references hereinafter to petitioner in the singular shall be to petitioner, Redman L. Turner. During the taxable year involved, petitioners and Louise Keltner owned and operated a restaurant business on certain Main Street premises in Campbellsville.[1] The petitioner

---

[1] During the taxable year before the Court, the restaurant business sustained a net loss from operations in excess of $6,000. Petitioner, however, derived ordinary income from two other primary occupational areas of endeavor, radio broadcasting and agriculture. He received dividend and salary income from several broadcasting companies and owned at least two operating farms during the year 1961. Additionally, petitioner was a small

had been in continuous occupancy of these premises, apparently as a restaurateur, since 1941. During the taxable year in question, 1961, petitioner was occupying the premises under a lease from Mattie G. Tucker, which had been executed on May 25, 1954. This lease was to run for a term of 10 years from June 1, 1954, at a monthly rental of $125, but would automatically be extended for another 3-year period (until May 31, 1967) if the petitioner did not notify the lessor, Tucker, of his intention to terminate. The petitioner was given the specific right to sublet the premises, subject only to the conditions that the leased property not be used as a poolroom and that petitioner continue to fulfill his general financial obligations under the lease.[2]

On July 2, 1961, the building occupied by the Citizens Bank & Trust Co. of Campbellsville was materially damaged by fire; it was imperative that the bank secure immediately some location in Campbellsville from which it would at least be possible to conduct its banking business. Accordingly, on a date between July 3, 1961 (the day after the fire), and July 8, 1961, the bank occupied, with petitioner's consent, the premises which petitioner had occupied continuously since 1941.

On July 8, 1961, a contract, styled by the parties as a "Lease And Agreement," was entered into between petitioner as "first party" and the bank as "second party." The relevant operative paragraphs of this agreement are as follows:

2. The first party hereby sub-lets and leases to second party the following described premises:

Certain premises in Campbellsville, Taylor Co., Kentucky, bounded on the north by Main Street; on the east by a building occupied by Crouch's Pool Room; on the south by an alley; and on the west by a building occupied by Scott & Smith Store. Including the upstairs and downstairs of the existing building on said premises with the appurtenances thereto.

_____

shareholder in the Citizens Bank & Trust Co., from which he received those payments, the nature of which constitutes the dispute in this case. Certainly it is accurate and fair to describe petitioner as an experienced businessman.

[2] The lease provided in pertinent part as follows:

\*   \*   \*   \*   \*   \*   \*

"2. Upon non-payment of any of said rent for a period of thirty (30) days after it shall become due and without demand made therefor or upon the breach of any of the other agreements herein contained, the lessor may terminate this lease and re-enter and re-possess said premises. Said lessor agrees, said lessee having performed all of his obligations under this lease, that said lessee shall quietly hold and occupy said premises during said term without any hindrance or molestation by said lessor, her heirs or any person lawfully claiming under her.

\*   \*   \*   \*   \*   \*   \*

"5. The lessee is given the right to sub-let all or any part of said premises so long as same is not used for a pool room or violates any part of paragraph two above.

"6. The term of this lease shall be for a term of ten years beginning June 1, 1954 at a rental of One-Hundred-Twenty-Five-Dollars ($125.00) per month payable on the first day of each and every month.

"7. This lease shall be automatically extended for a further term of three years beginning June 1, 1964 and ending May 31, 1967, upon the same terms herein unless lessee shall notify lessor in writing thirty (30) days before the expiration of the said ten year term of his intention to terminate same."

3. First party represents to second party that he has full right and authority to sub-lease said premises by reason of the terms of the attached lease whereby his lease to said premises is for a term of ten years beginning June 1, 1954.

4. For the sum of Seventeen Thousand Five Hundred Dollars ($17,500.00) paid by second party to first party, first party does and has surrendered said premises to second party and said consideration is for first party ceasing the operation of his restaurant business and surrendering said premises to second party.

5. However, second party agrees to pay to first party the sum of Three Hundred Fifty Dollars ($350.00) per month for a term of two years beginning July 1, 1961, with the right and privilege of second party terminating said premises at the end of any calendar month in which event second party will cease paying to first party the said monthly rental of $350.00.

6. It is mutually agreed that the terms of this sub-lease and contract is upon the same terms and conditions as set out in the attached and referred to lease herein between Redman L. Turner and Mattie G. Tucker, but same is subject to the terms and conditions of this sub-lease and nothing in the original lease dated May 25, 1954, shall be contrary to any term or terms of this sub-lease.

The purpose, effect, and essence of the agreement was to grant the bank the immediate right to occupy the premises upon which petitioner had been conducting his restaurant business in return for certain specified payments by the bank to petitioner. It is the character of a portion of these payments in the hands of petitioner which constitutes the issue in this case.

By the terms of the agreement, the bank was given the right to occupy the premises for a period of 2 years beginning July 1, 1961, with the privilege of terminating the occupancy earlier at its option. The expiration of the bank's term of 2 years would thus occur not later than June 30, 1963, some 11 months prior to the earliest possible date for the expiration of petitioner's obligations under his head lease with Mattie G. Tucker.[3] Accordingly, it is clear that petitioner did not part with all of his right, title, and interest in the lease and cannot be said to have assigned his leasehold interest to the bank. Throughout their "Lease And Agreement," in fact, petitioner and the bank obviously recognized the underlying and continuing obligations of petitioner to his lessor under the lease.[4]

The petitioner and the bank, in arriving at the appropriate monetary compensation which would become due to petitioner, attempted to segregate the agreed-upon remuneration into two separate categories, the first being a lump-sum payment of $17,500 and the second being a regular monthly payment of $350 which the parties denominated as "monthly rental."[5] The lump-sum payment, which is the only amount in issue here, was intended by the parties to be for the two pur-

---

[3] The minimum term under the head lease was for 10 years, this term expiring on May 31, 1964. See pars. 6 and 7, fn. 2, *supra*.

[4] See, e.g., pars. 3 and 6 of the agreement quoted, *supra*.

[5] See par. 5 of the agreement, *supra*.

poses which appear in the following excerpt from their agreement: [6]

For the sum of Seventeen Thousand Five Hundred Dollars ($17,500.00) paid by second party [bank] to first party [petitioner], first party does and has surrendered said premises to second party and *said consideration is for first party ceasing the operation of his restaurant business* and *surrendering said premises to second party*. [Emphasis added.]

During the period of the bank's occupancy, petitioner received payments totaling $18,940 pursuant to the mentioned agreement. The agreement itself was terminated and possession of the premises was surrendered by the bank on November 16, 1961, so that the bank occupied petitioner's leasehold property for a period only slightly in excess of 4 months and 1 week. The bank and petitioner entered into a written agreement as of that date canceling their earlier agreement of 4 months before. The language of the terminating instrument repeatedly refers to the agreement of July 8, 1961, between petitioner and the bank as a sublease. It provided in pertinent part as follows:

THIS AGREEMENT, made and entered into by and between CITIZENS BANK & TRUST COMPANY, INC., of Campbellsville, Taylor County, Kentucky, first party, and REDMAN L. TURNER of Campbellsville, Taylor County, Kentucky, second party,

### WITNESSETH

That by an instrument dated July 8, 1961, Redman L. Turner *sub-leased* to Citizens Bank & Trust Company, Inc., the leased premises described in that certain lease from Mattie G. Tucker to Redman L. Turner dated May 25, 1954, recorded in ——————— Book ———, page ———, Taylor County Court Clerk's Office, and said *sub-lease* provided that Citizens Bank & Trust Company, Inc., had the right and privilege of terminating said *sub-lease* at the end of any calendar month, and said bank has heretofore notified Redman L. Turner that said *sub-lease* is terminated.

Now, THEREFORE, in consideration of the premises and the sum of ONE & NO/100 DOLLARS ($1.00), cash in hand paid, receipt of which is hereby acknowledged, Citizens Bank & Trust Company, Inc., of Campbellsville, Kentucky, does hereby terminate the aforesaid *sub-lease* dated July 8, 1961, and it does hereby surrender immediate possession of said premises to Redman L. Turner.

[Emphasis added.]

On the same day this agreement was signed the bank surrendered possession of the premises and petitioner sublet them to the R. H. Hobbs Co. for the balance of the term of his lease at a monthly rental of $350. The sublessee was required by the new agreement to pay $125 per month to Mattie G. Tucker, the original lessor, and $225 per month to petitioner. Presumably the head lease would now run until May 31, 1967, because the right to terminate the automatic 3-year extension of the head lease was specifically relinquished by

---

[6] This excerpt is par. 4 of the agreement, *supra*.

petitioner.[7]  None of the sums received by petitioner pursuant to the R. H. Hobbs Co. sublease in the year 1961 are in issue.  Note is taken of the valuable Hobbs Co. sublease only to demonstrate further that petitioner had not transferred the entirety of his leasehold interest (a fact already found) upon consummating the transaction of July 8, 1961, with the bank.

Respondent and petitioner have agreed that of the total payments received from Citizens Bank & Trust Co. in 1961 ($18,940), the periodic payments which were called for by the agreement with the bank amounted to $1,440 and this sum is properly treated as rental income.  The only other payment received from Citizens Bank pursuant to the agreement was the $17,500 lump-sum payment which constituted the consideration for petitioner's "ceasing the operation of his restaurant business and surrendering [the] premises."  Of this $17,500 lump-sum payment, respondent has agreed that $4,375 was the property of Louise Keltner, with whom petitioner had been engaged in the restaurant business.  The dispute then concerns the remaining $13,125 which petitioner would treat as capital gain and which respondent has determined to be ordinary income in the form of rent.

At no point does the record tend to show that the bank acquired, intended to acquire, or bargained for any of the tangible or intangible assets of petitioner's restaurant business.  The record is equally barren of any evidence that the bank received any of these assets which, taken together, comprised the going-concern value of petitioner's restaurant business.  During July of 1961, petitioner did dispose of considerable equipment used in his restaurant business, such as the ice machine, slicer, scales, and certain fixtures.  Not all equipment which had been used in the business was sold before the end of the tax year, however.

On August 25, 1964, respondent mailed the statutory notice of deficiency to petitioner, having determined a deficiency in the amount of $3,256.75.  Since that time, petitioner and respondent have made mutual concessions regarding certain business income items not germane to the basic dispute concerning the nature of the bank's lump-sum payment.  Consequently, there remains only the single question for our determination.

---

[7] The Hobbs Co. sublease is a three-party agreement in which petitioner is designated as first party, Hobbs Co. as second party, and Mattie G. Tucker, the original lessor, as third party.  The sublease provides that:

"The term of this sub-lease shall be for a period expiring on May 31, 1964, and shall automatically extend for a further term of three (3) years beginning June 1, 1964, and ending May 31, 1967 * * *  It is specifically agreed between all three parties herein that the first party [petitioner] shall not have the right to terminate the original lease pursuant to Clause 7 thereof by notifying the third party [Mattie G. Tucker] of his intention to terminate."

OPINION

*I*

Respondent determined that the whole of petitioner's share of the lump-sum payment ($13,125) was rental income, and that petitioner's transaction with the bank is in toto a sublease. Petitioner relies almost exclusively on the language of his "Lease And Agreement" with the bank to show that he has sold or exchanged a capital asset within the meaning of sections 1221 and 1222 of the Internal Revenue Code of 1954.[8] The instrument simply stated that the lump-sum payment received by petitioner was as consideration for his "ceasing the operation of his restaurant business and surrendering said premises." Respondent contends, we think properly, that the ceasing of the operation of petitioner's business was merely a necessary portion of his giving the bank immediate possession and that no capital asset was sold or exchanged in connection with the lump-sum payment from the bank. Petitioner, for his part, has lent little aid in our quest to determine exactly what capital asset he contends was involved. Even if we could conclude that petitioner had sold his restaurant business to the bank as a going concern, a far-fetched conclusion which we could not reach under the evidence of record, still respondent would in all likelihood prevail.

It is well settled now that the sale of a proprietorship as a going business constitutes the sale of the several sorts of assets, some capital and some not, which together give the business value. The business must be "comminuted into its fragments." *Williams* v. *McGowan*, 152 F. 2d 570, 572 (C.A. 2, 1945); *Andrew A. Monaghan*, 40 T.C. 680 (1963). More important, the burden would lie upon petitioner to prove what portion of the amount received was properly allocable to any capital assets which might have been sold or exchanged. *Violet Newton*, 12 T.C. 204 (1949). Petitioner has come forward with no such proof.

Though it is not altogether clear, petitioner seems to urge essentially that he has parted with goodwill which he amassed as a restaurateur serving meals in the same building for 20 odd years.[9] It may be that the value of petitioner's goodwill in the restaurant business has declined, if indeed such goodwill ever existed.[10] Be that as it may, petitioner has not parted with whatever goodwill attached to his

---

[8] Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954.

[9] This is a surmise based upon petitioner's emphasis of the fact that he had been engaged in the restaurant business for many years at the same location. Further, there seems to have been little else in petitioner's business not otherwise disposed of which could possibly constitute a capital asset or a sec. 1231 asset.

[10] No evidence has been presented as to this question; we note, however, that the business operated at a loss in 1961. See fn. 1, *supra*.

restaurant business; petitioner has not obligated himself to refrain from operating a restaurant. There is no covenant to this effect in any of the agreements. Even if there were, we take it to be incontrovertible in the tax law that goodwill does not exist except in connection with a going business and cannot be separated from the going business to which it is incident. *Grace Bros., Inc.* v. *Commissioner*, 173 F. 2d 170 (C.A. 9, 1949), affirming 10 T.C. 158 (1948); see also *William M. Wailes*, 25 B.T.A. 278 (1932), which specifically involves locational goodwill in a deduction context.

In *Grace Bros., Inc.*, *supra*, the taxpayer was a corporation which for many years had been engaged in the production of wine. During the taxable year in question the taxpayer decided to discontinue wine production and accordingly sold its inventory of wine to another vintner in addition to leasing its physical plant to him. In upholding our finding that there had been no transfer of goodwill to the buyer of the inventory who was also the lessee of the plant, the Court of Appeals for the Ninth Circuit attached considerable importance to the fact that (as here) the taxpayer never undertook not to engage in the business which was being discontinued. *Grace Bros., Inc.*, *supra* at 176. This and other facts relevant to the negotiations persuaded the Court of Appeals that we were correct in determining that though the taxpayer had parted with its inventory, certain business accessories, and leased its plant to a *competitor*, still there had not been a transfer "of goodwill or of the business as a *unitary whole.*" *Ibid.*

We do not cite the *Grace Bros.* case to demonstrate that we are bound to reach the result reached therein because the operative facts here are somewhat similar; indeed, this would be contrary to the basic principle of *Grace Bros.* which is that in the last analysis, each case depends upon its particular facts and that goodwill does not exist separately from the going business of which it is a part. *Id.* at 176, 178. The *Grace Bros.* case merely makes plain that we have ample latitude to decide, as we do, that petitioner in the instant case has not sold or exchanged his going business or any capital asset-component thereof to the bank.[11] The entire record indicates that

---

[11] This Court has found upon occasion that even where there is a covenant not to compete, the payments received in consideration of taxpayer's ceasing operations are not necessarily received for the sale or exchange of taxpayer's going business. See, e.g., *George Prince*, a Memorandum Opinion of this Court dated Apr. 22, 1942. In *Prince*, the City of Natchez, Mississippi, paid petitioners $130,000 to discontinue operation of a ferry business so that the city might qualify for Government funds with which to build a toll bridge. The Reconstruction Finance Corporation required that competition with the proposed bridge be eliminated before funds could become available. We held that the petitioners had conveyed no tangible or intangible assets to the city, including their goodwill. The city there, much like the bank here, was not interested in acquiring the ferry business as a going concern.

the bank was not interested in acquiring petitioner's restaurant business as a going concern, even if such an acquisition were legally possible under the applicable banking laws. It did not seek to do so nor by any stretch of the imagination could we conclude that here it did. It merely acquired the space in which petitioner operated that business and as a concomitant petitioner ceased the restaurant operation there so that banking could be carried on.

## II

In the event that our findings of fact did not make it sufficiently plain, petitioner cannot be said to have assigned the entirety of his leasehold interest as a capital asset. *Lee Ruwitch*, 22 T.C. 1053 (1954). So many incidents of retained interest in the leasehold are present that such an assignment is clearly not possible in this factual situation. See *Voloudakis* v. *Commissioner*, 274 F. 2d 209 (C.A. 9, 1960), affirming 29 T.C. 1101 (1958).

## III

Finally, petitioner suggests an argument to the effect that the right to continue in business is a capital asset, relying on the wording of section 1221 that all "property" which is not excluded by that section is a capital asset. Petitioner, however, has not been able to point out any authority holding the right to continue in business to be a capital asset and we have found none. Petitioner relies on *News Leader Co.*, 18 B.T.A. 1212 (1930), but that case is not authority for the theory adduced and is clearly distinguishable factually.

It is now well accepted that not everything which may be called a property right in the ordinary or fifth amendment sense and which is outside the statutory exclusions of section 1221 or section 117(a)(1) of the 1939 Code is to be considered a capital asset. See, e.g., *Hort* v. *Commissioner*, 313 U.S. 28 (1941). In *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130 (1960), taxpayer's business had been regulated to some extent by a Government agency and after the conclusion of the Second World War the taxpayer was recompensed by a special claims commission. The commission determined that by assuming control of the taxpayer's transport facilities, the Government had deprived the taxpayer of the valuable right to determine freely what use was to be made of the facilities. The commission granted an award based upon the fair rental value of the property. In upholding the Commissioner of Internal Revenue in his determination that the rights given up by the taxpayer did not constitute a capital asset, the Supreme Court said:

In short, the right to use is not a capital asset, but is simply an incident of the underlying physical property, the recompense for which is commonly regarded as rent. [*Gillette Motor Co.*, *supra* at 135.]

Petitioner here had no investment in his right to do business on the leased premises. He suggests no means by which a cost basis could be assigned to this right. We think, again, that petitioner is alluding primarily to the locational goodwill which he may have accumulated over his long years of occupying the same premises. However, as we have earlier observed, this variety of goodwill, like any other, does not exist separately from the going business of which it is a part. See *William M. Wailes, supra* at 280. Goodwill inheres in the business, which was not sold or exchanged here, and does not adhere to the physical premises in which the business was being conducted.

There has been no sale or exchange of any capital or section 1231 asset in connection with the lump-sum payment received from the bank. The evidence of record compels the conclusion that all the bank sought to acquire or buy was the immediate right to possession and use of petitioner's leased premises. This is what was paid for and the payment for use and possession was rent as determined by the Commissioner. Respondent must prevail.

Due to concessions made by the parties,

*Decision will be entered under Rule 50.*