OPINION Eespondent’s position that the payments in issue are taxable as ordinary income is based upon four principal arguments: (1) The Canadian agreement was not a bona fide agreement of sale but rather a paper transaction set up between a parent corporation and its wholly owned subsidiary to alter the tax consequences of a preexisting licensing arrangement; (2) petitioner did not own the patents listed in the Canadian agreement but had only the right to grant CAFCAN a nonexclusive license to manufacture and to license others to use the patents in Canada; (3) the CAFCO formulas and “know-how” did not have the quality of exclusivity so as to constitute “property” within the purview of sections 1221 or 1231, I.E.C. 1954 j[1] (4) where an entire business is sold in a “package deal,” it does not constitute a single capital asset but several individual assets, among which the sales price must be allocated to determine tax consequences; and to the extent that any part of the intangibles transferred under the Canadian agreement constituted section 1221 or section 1231 property, petitioner failed to prove a portion of the entire consideration allo-cable to it. It is petitioner’s contention that under the Canadian agreement which became effective on or about March 16, 1959, it transferred all substantial rights in certain patents, trademarks, applications, and know-how, which it had possessed for more than 6 months, to a separate entity, its wholly owned Canadian subsidiary, giving rise to capital gains treatment of the proceeds of the “sale” under sections 1221 and 1231. Petitioner argues that the principal portion of the know-how was secret and was a requisite to the profitable utilization of the patents and trademarks; the remainder was an incident of the patents and trademarks and assumed their nature. Petitioner does not contend that it was a “holder” of the property rights within the meaning of section 1235.[2] We first consider respondent’s contention that petitioner and CAF-CAN did not in fact make a bona fide agreement of sale on March 16, 1959, the date appearing on the subsequently drafted Canadian agreement. It is well established that “an agreement between a corporation and its sole stockholders [or, it follows a fortiori, its wholly owned subsidiary] is valid and enforceable, if the arrangement is fair and reasonable, judged by the standards of the transaction entered into by parties dealing at arm’s length.” Stearns Magnetic Mfg. Co. v. Commissioner, 208 F. 2d 849, 852 (C.A. 7, 1954) ; Leonard Coplan, 28 T.C. 1189 (1957). Two key factors convince us of the bona fides of the transaction between petitioner and CAFCAN. First, the location of the entire manufacturing process for the Canadian market within Canada was motivated by business considerations. The Canadian Government began in 1958 granting a 10-percent preference in Government contracts to products manufactured in Canada. CAFCAN would have lost a substantial portion of its business if it had been compelled to compete at this disadvantage. In addition, the location of the manufacturing facilities in Canada caused a reduction in raw material costs since the asbestos used in the CAFCO products comes from Canadian sources. Secondly, tlie sales price of 3 cents per pound of fiber mixed by CANCAN was reasonable in comparison with payments made by other companies located outside tbe United States which distributed the CAFCO products. See Stearns Magnetic Mfg. Co. v. Commissioner, supra. Respondent refers to the Canadian agreement as “window-dressing,” citing the predating as an attempt to retroactively alter tax consequences. Clearly, however, it “is competent for the parties to agree that a written contract shall take effect as of a date earlier than that on which it was executed, and when this is done, the parties will bo bound by such agreement.” Brewer v. National Surety Corporation, 169 F. 2d 926, 928 (C.A. 10, 1948). After a careful review of the evidence before us, we hold that the facts comport to the form of the transaction, i.e., the existing licensing arrangement between petitioner and CAFCAN was transformed into a complete sale of petitioner’s Canadian operations to CAFCAN on or about March 16, 1959. We note that the agreement provides that its terms relate back to June 15, 1958; the parties concede that CAFCAN did not begin operations until August 1958, and the evidence indicates that it operated as a licensee for a few months. See Rose Marie Reid, 26 T.C. 622 (1956). In essence, what we have here is the transfer of a-going business in Canada carried on by a U.S. corporation with the marketing aid of a Canadian distributor to a wholly owned Canadian subsidiary formed for the purpose of carrying on the entire operation within the bounds of Canada.[3] We decline, however, to treat the business as a single asset and determine whether it is essentially capital in nature, as petitioner would have us do, but instead we shall categorize the various assets transferred and determine their taxable nature individually. Redman L. Turner, 47 T.C. 355 (1967); Watson v. Commissioner, 345 U.S. 544 (1953); Williams v. McGowan, 152 F. 2d 570 (C.A. 2, 1945). See also Bramerd, “Income From Licensing Patents Abroad,” 38 Taxes 209 (1960). Five Canadian patents listing Kempthorne as inventor covering spray equipment (relating to the model A machine) and processes and one Canadian patent issued in the joint names of Stumpf and Kemp-thorne were granted to CAFCAN under the Canadian agreement “to manufacture, use and sell, and to grant to others sub-licenses to manufacture, use and sell, products embodying the inventions” within the territorial limits of Canada. A patent is intangible property whose value is protected by a Government-imposed monopoly for a period of time over which its development costs are normally depreciable. Sec. 1.167 (a)-3, Income Tax Kegs. Because it constitutes depreciable property when used in the operation of a business, it does not qualify as a capital asset under section 1221, but, if held for more than 6 months, its sale or exchange may result in capital gain under section 1231.[4] See 3B Mertens, Law of Federal Income Taxation, secs. 22.126 and 22.133 (1966 rev.). Petitioner (through CAFCUS) was in the business of selling products, not patents. See Albright v. United States, 173 F. 2d 339 (C. A. 8, 1949). Therefore, the patents and patent application, which were the subject of the transfer of CAFCAN, did not constitute petitioner’s stock in trade or inventory, nor were they “property held by [petitioner] primarily for sale to customers in the ordinary course of [its] trade or business.” The determinative question remains, however, whether the transfer in question constituted a “sale” or a “license.” If it was in the nature of a license, the consideration paid for it constituted a royalty and is taxable as ordinary income. Sec. 61(a)(6); Redler Conveyor Co. v. Commissioner, 303 F. 2d 567 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court. Whether the payment is made in a lump sum or over a period of time in amounts based upon the use of the invention by the grantee is immaterial to this determination. Arthur C. Ruge, 26 T.C. 138 (1956); Vincent A. Marco, 25 T.C. 544 (1955). To determine tbe quantum of interest in the five Kempthorne patents transferred to CAFCAN under the Canadian agreement, we must look first to the legal relationships established by the Kempthorne agreement. Kempthorne granted to CAFCUS the exclusive right to manufacture, and the exclusive right to sell throughout the world except in the Metropolitan New York area, the sprayed-insulation materials and equipment developed by him for the period from February 24, 1954, to April 1, 1959. Upon the termination of that period without renewal, both Kempthorne and CAFCUS were to have the right to license others upon a nonexclusive basis to use the patents and invention rights. It is clear from the terms of the agreement that Kempthorne retained ownership of his patents and inventions. The most critical factor was the limitation of the contract period to approximately 5 years, a period not coterminous with the lives of the patents. See Redler Conveyor Co., supra; Thomas D. Armour, 22 T.C. 181 (1954); Lynne Gregg, 18 T.C. 291 (1952), affd. 203 F. 2d 954 (C.A. 3, 1953). Since CAFCUS received limited rights in the patents, less than the whole interest which Kempthorne possessed and could have transferred to it, the transfer constituted a license, not a sale. Waterman v. Mackenzie, 138 U.S. 252 (1891). Plainly, petitioner transferred under the Canadian agreement all substantial rights it may have possessed in the patents to CAFCAN. The grant was for the lives of the patents and embodied the magic language “manufacture, use and sell” (Waterman v. Mackenzie, supra); the right of petitioner to terminate upon certain conditions subsequent did not constitute the retention of “substantial rights.” Allen v. Werner, 190 F. 2d 840 (C.A. 5, 1951); Commissioner v. Celanese Corp. of America, 140 F.2d 339 (C.A.D.C.1944). Petitioner could, however, convey to CAFCAN no greater rights than it possessed. CAFCUS received a license in patents from Kempthorne and could, in turn, grant to others no more than a sublicense. Federal Laboratories, Inc., 8 T.C. 1150 (1947). It should be noted that nowhere in this record do we find direct evidence that CAFCUS transferred its rights under the Kempthorne agreement to petitioner. CAFCUS operated as a separate legal entity and filed its Federal income tax returns as such during the years in issue. We hold that any amounts received by petitioner as a consequence of the transfer of its rights in the five Kempthorne patents listed in the Canadian agreement constituted royalty income. We likewise conclude that, to the extent of Kempthorne’s interest, CAFCAN received a sublicense in the Canadian patent on the dust-control device issued jointly to Kempthorne and Stumpf. We are not persuaded on this record by petitioner’s argument that Kempthorne bad no valid interest in the patent because Stumpf did the final development of the invention. Since Stumpf’s interest was assigned absolutely to petitioner, petitioner was in a position to, and did in fact, sell that interest to CAFCAN. Petitioner possessed, through assignment from Stumpf, all property rights in the model H machine, which had been reduced to practice more than 6 months prior to the date of the Canadian agreement. The Canadian patent application, which constituted a manifestation of these rights, was assigned absolutely for its life to CAFCAN under the Canadian agreement. A patent application is an assignable property right (Saunders v. Commissioner, 29 F. 2d 834 (C.A. 3, 1928)), but not a depreciable asset. When the patent is issued depreciation may be taken over its life. Hershey Manufacturing Co., 14 B.T.A. 867 (1928), affd. 43 F. 2d 298 (C.A. 10, 1930). We hold that the application constituted a capital asset which was sold. See Samuel E. Diescher, 36 B.T.A. 732 (1937), affd. 110 F. 2d 90 (C.A. 3, 1940), certiorari denied 310 U.S. 650 (1940). The second category of assets transferred under the Canadian agreement consisted of the Canadian trademark and trademark applications, the exclusive use of which was granted to CAFCAN for all of Canada for the lives of the trademarks. The common-law right to prevent unfair competition and the statutory right permanently to exclude others from the use of a registered name certainly are valuable property rights which may be assigned. Those rights with respect to the names referred to in the Canadian agreement constituted capital assets which were sold under the agreement. Seattle Brewing & Malting Co., 6 T.C. 856 (1946), affd. 165 F. 2d 216 (C.A. 9, 1948); see also Norwich Pharmacal Co., 30 B.T.A. 326 (1934). The Canadian trademark “CAFCO” was issued on December 21, 1956; the trade names for which Canadian trademark applications had been made were first used in September 1958. The third category of assets transferred may be loosely termed “know-how”[5] and is represented by the manuals, reports, and other documents. Petitioner argues, and respondent denies, that the ideas reduced to tangible form in these papers possess the attributes of “property” within the meaning of section 1221. An inventor’s property right in his invention exists at the time of its reduction to actual practice; a patent later granted for the invention merely creates an additional monopoly right to exclude others from its use for a period of years. Samuel E. Diescher, supra. The right of property in industrial knowledge has long been recognized by this Court. George S. Mepham, 3 B.T.A. 549 (1926). Similarly, we have held that a secret formula used in a manufacturing business constitutes property. Wall Products, Inc., 11 T.C. 51 (1948). Neither the fact that the formula is simple and may be broken down into its constituent parts by a competent chemist[6] nor that a patent for the formula has not been applied for negatives the property right. Wall Products, Inc., supra. Without question, the formulas for the CAFCO products were the heart of petitioner’s business. The parties agree that if they were “secret,” they constituted “property” within the meaning of section 1221. This record is replete with conflicting testimony on this point, largely as a result of the apparent ill will between Kempthorne and petitioner’s officers. Concrete evidence relating to competitor’s formulas was not made available and the exact formulation of the various CAFCO products as compared to SprayDon formulas developed by Kempthorne prior to 1954 is far from clear. But, on the preponderance of the evidence, we have found as a fact that the Kempthorne formulas were changed substantially without the aid or knowledge of Kempthorne after Stumpf became an employee of petitioner and were, at the time of the transfer to CAFCAN, trade secrets. All products in the sprayed-insulation field are composed of essentially the same basic ingredients. Not all, however, have the same heat or flame retarding or acoustical properties, as a result of a variance in the quality and quantity of the various ingredients and the method by which they are mixed. This is reflected by the great weight afforded the Underwriters’ Laboratories, Lie., tests and factory label procedures throughout the industry. Consistency in performance and economy in application are the most essential attributes of a successful product and depend entirely upon a precise formulation. “CAFCO Spray Standard” developed by Stumpf differed from Kempthorne’s basic formulation, “SprayDon Fire Test Fiber” (and initially called CAFCO Spray Fiber by petitioner), in at least three material respects: (1) The average variance in the percentages of the three ingredients (or groups of ingredients) common to both products was approximately 23 percent; (2) CAFCO Standard was mixed according to a precise recipe controlling both the order and time of mixing, while Kempthorne mixed his product without order and for imprecise periods of time; and (3) CAFCO Standard contained a single (alternative) grade of Canadian asbestos while the Kemp-thorne product contained a blend of three particular grades of Canadian asbestos. The formulation for CAFCO Spray Type 1 differed from the SprayDon formulation to even a greater extent. A “Factory Inspection. Procedure” issued September 21,1956, on “CAFCO Spray Type 1” revising an earlier procedure on “CAFCO Spray Fiber” (which, again, was identical to SprayDon Fire Test Fiber) set out a formulation in which the percentage of the various ingredients varied greatly, with over a 600-percent increase in the percentage of cementitious materials. It is clear that the formulas were “so substantially improve[d] that [petitioner] became invested with the ownership.” Reynolds Metals Co. v. Skinner, 166 F. 2d 66, 76 (C.A. 6, 1948). And it appears from this record that, as a corollary to this change in formula, the performance of the CAFCO products was substantially changed. It follows, therefore, that the formulas acquired from Kempthorne by Asbestos Spray in 1950 and Smith & Kanzlor in 1958, two of petitioner’s competitors, were not the same formulas transferred by petitioner to CAFCAN. Petitioner carefully protected its formulas from becoming known in the trade, particularly in its dealings with its licensee in Australia and with CAFCAN before the final “sale” was made. The “basic ingredient” was mixed by petitioner and was then shipped to the licensees who, within their own territories, blended it with the other ingredients to form the final products. By keeping the formula for the basic ingredient secret, petitioner was able to prevent the overall formulas from becoming known in the trade. They were no less trade secrets because of a breach of confidence by Richard L. Kempthorne, the son of James Kempthorne, in copying them before leaving the employ of petitioner. Petitioner’s interest in the formulas was sufficient to evoke injunctive relief to prevent Richard L. Kemp-thorne from using them or disclosing them to others. Club Razor & Blade Mfg. Corporation v. Bindzsus, 131 N.J. Eq. 283, 25 A. 2d 31 (1942); Nelson v. Commissioner, 203 F. 2d 1 (C.A. 6, 1953), reversing a Memorandum Opinion of this Court. We hold that the formulas constituted “property” as that term is used in section 1221.[7] The design of a special device created by petitioner to measure the bulk density of fibers was transferred to CAFCAN as part of the “know-how.” The evidence indicates that it was not known to the trade, and respondent does not contend otherwise. Accordingly, we hold that it constituted a capital asset. By granting to CAFCAN the exclusive right within the territorial limits of Canada to use and to grant to others the right to use the formulas and the design, petitioner conveyed its most important property right in them, viz, the right to prevent unauthorized disclosure. See E. I. Du Pont De Nemours and Co. v. United States, 288 F. 2d 904 (Ct. Cl. 1961). Consequently, we hold that they were the subject of a “sale” rendering the gain realized taxable at capital gains rates. The finished product specifications, quality-control procedures, and the test data and research reports relating to the properties of the CAFCO products constituted technical information unique to the CAFCO products and necessary for the effective utilization of the transferred formulas. The formulas for CAFCO adhesive and sealer were essential to CAFCAN in order to obtain a supply for its distributors. Without these products a proper application of the CAFCO products would have been difficult or impossible. This information was an incident of the patents and assumed their nature as capital assets. Heil Co., 38 T.C. 989 (1962). Our conclusion is the same with respect to the bulk of the other materials contained in the manuals which dealt principally with sales, cost estimating, and application techniques. Even though much of the material was available to competitors, it constituted valuable marketing information, developed through practice, which was oriented toward the particular properties of the CAFCO products and which could be obtained from no other source. Assuming arguendo that this information was tantamount to consulting services, as respondent contends, we find that it was of the type usually called for to implement the sale of highly technical inventions and, thus, was ancillary and subsidiary to the assignments of the formulas and the patent application. Arthur C. Ruge, 26 T.C. 138 (1956); see also Rev. Rul. 55-17, 1955-1 C.B. 388. The vast majority of the materials comprising the “know-how” transferred to CAFCAN was compiled and dated before March 16, 1959. The remainder we consider de minimis with respect to our conclusion that the “know-how” constituted a capital asset held by petitioner for more than 6 months prior to its transfer to CAFCAN. Finally, we must allocate the sales price in accordance with our comminution of the bundle of rights transferred into its fragments. Williams v. McGowan, supra. There is no question that the deferred payments should be included in income when received. See C. W. Titus, Inc., 33 B.T.A. 928 (1936). The only patent transferred by Kempthorne under the Kempthorne agreement which proved .to be of substantial value to petitioner was the model A machine patent. After the development of the model H machine, the model A machine became impractical for all but a very limited number of jobs and was not manufactured thereafter. The only patent transferred under the Canadian agreement, then, which had any significant value as of March 16, 1959, was the patent issued jointly to Stumpf and Kempthorne for the dust-control device. The patent application on the model H machine and the secret formulas and incidental know-how represented the lion’s share of the value transferred to CAFCAN. Accordingly, we conclude on this record that the entire 3 cents per pound constitutes consideration paid for the sale of capital assets and section 1231 assets owned by petitioner. See Arthur C. Ruge, supra; cf. Redman L. Turner, 47 T.C. 355 (1967); Rev. Rul. 55-17, 1955-1C.B. 388. In order to reflect certain adjustments not contested by petitioner, Decision will be entered under Rule 50. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term “capital asset” means property held by the taxpayer (whether or not connected with his trade or business), but does not include— (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property, held by— (A) a taxpayer whose personal efforts created such property, or (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in, part by reference to the basis of such property in the hands of the person whose personal efforts created such property; (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1) ; or (5) an obligation of the united States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. — If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * * This Court has held that “If a transfer is not one described in subsec. (q) [of see. 117, I.R.C. 1939, which was the progenitor of sec. 1235, I.R.C. 1954], the provisions of thisl subsection have no application in determining whether or not such transfer constitutes a| sale or exchange of a capital asset; and the tax consequences of such transfer must bel determined under other provisions of the internal revenue law.” F. H. Philbrick, 27 T.C. 346, 355 (1956). See also Leonard Coplan, 28 T.C. 1189 (1957). See. 1249 specifically covers transactions such as the one in issue here consummated after Dec. 31, 1962. 'SEC. 1249(a). General Rule. — Gain from the sale or exchange after December 81, 1962, of a patent, an invention, model, or design (whether or not patented), a copyright, a secret formula or process, or any other similar property right to any foreign corporation by any United States person (as defined, in section 7701 (a) (30)) which controls such foreign corporation shall, if such gain would (but for the provisions of this subsection) be gain from the sale or exchange of a capital asset or of property described in section 1231, be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. [Emphasis supplied.] with respect to whether this section constitutes a codification or a change in preexisting legal principles, we note the Senate Finance Committee explanation of the purpose of the section: “Your Committee recognizes that the transfer of U.S. developed patent and similar rights by a U.S. corporation to a controlled foreign corporation causes a diversion of income from U.S. sources. It believes that taxing any gain on such transfer as ordinary income will, however, correct this situation as to such transfers in the future.” (S. Kept. No. 1881, 87th Cong., 2d Sess. (1962).) SEC. 1231(b). Definition of Property used in the Trade or Business. — Nor purposes of this section— (1) General Rule. — The term “property used in the trade or business” means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not— (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221. See generally Bralnerd, “Income From Licensing Patents Abroad,” 38 Taxes 209, 229-234 (1960). Respondent has shown in this ease no more than that it is theoretically possible to break the CAFCO products down into their component parts after a complicated and costly laboratory process. In o-ther contexts, it has been held that the term “property” within the tax laws should not be given a narrow or technical meaning. See, e.g., United States v. Graham, 96 F. Supp. 318 (S.D. Cal. 1951), affirmed sub nom. 195 F. 2d 530 (C.A. 9, 1952), certiorari denied 314 U.S. 831 (1952) ; Citizens State Bank of Barstow, Tex. v. Tidal, 114 F.2d 380 (C.A. 10, 1940).